THOMAS P. McNALLY, TRUSTEE, AND SHIRLEY J. McNALLY,
TRUSTEE, APPELLANTS, v. CITY OF OMAHA AND CITY
OF OMAHA BOARD OF REVIEW, APPELLEES.

731 N.W.2d 573

Filed May 18, 2007. No. S-05-1022.

Andrew D. Strotman and Stanton N. Beeder, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellants.

Alan M. Thelen, Assistant Omaha City Attorney, for appellees.

Daniel G. Crouchley, Susan E. Prazan, and Patrick L. Tripp for amicus curiae Metropolitan Utilities District of Omaha.

HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and CASSEL, Judge.

McCORMACK, J.

## I. NATURE OF CASE

Thomas P. McNally and Shirley J. McNally appeal from the Douglas County District Court, which affirmed a decision of the City of Omaha Building Board of Review (the Board) denying the McNallys' challenge of a "Notice of Violation" (violations notice) issued by the City of Omaha code inspectors on a rental property.

## II. BACKGROUND

The McNallys own a duplex in Omaha, Nebraska, which they rent out to tenants. On April 22, 2004, the City of Omaha Planning Department sent the McNallys a violations notice. The violations notice was accompanied by a violations list. The notice stated that the duplex was in violation of the Omaha Municipal Code (the Code) and was declared to be unsafe, unfit for human occupancy, or unlawful, because of the violations designated in the violations list. The McNallys were ordered to repair or cure the violations by June 24 or else the property would be placarded and occupancy would be prohibited until the violations were cured and released.

There were seven specified aspects of the duplex which the city alleged were in violation of city ordinances: (1) the fact that the furnaces were installed without City of Omaha permits or inspections; (2) large cracks in the brick exterior walls on the north and east sides; (3) an upheaved sidewalk from the front

door to the driveway; (4) unpainted stucco where doors were removed on the east side of the second floor; (5) a window at the second floor, west side, not "painted in [a] workman like [sic] manner"; (6) tuck-pointing at the front entry stairs not done in a "workman like [sic] manner"; and (7) loose and missing glazing putty on all sides.

The McNallys appealed the designation to the Board, although the McNallys eventually agreed to repair the loose and missing glazing putty. Mike Johnson, a housing code inspector, responded with a case analysis for the Board which described the reasons Johnson thought the relief requested in the McNallys' appeal should be denied. A hearing was conducted before the Board. Johnson and Kevin J. Denker, the chief code inspector, presented various photographs of the duplex and made their arguments to the Board. Thomas McNally also presented his evidence and argument.

With regard to violations (4) through (6), the evidence presented to the Board showed that a front upper-level paned glass casement window had paint on the glass resulting from painting the trim. Photographs demonstrated that various cracks in the masonry sidewall of the front stoop were repaired by tuck-pointing, but that the mortar used was uneven in its application. The unpainted stucco violation stemmed from the fact that a back upper door opening onto an awning roof had been cemented in, and the stucco finishing on the cement was never painted to match the rest of the house.

The unpainted stucco, the poorly painted window trim, and the "unworkmanlike" tuck-pointing were alleged to violate § 303.2 of the 2000 International Property Maintenance Code (IPMC), "Protective treatment" (see Omaha Mun. Code, ch. 48, art. I, §§ 48-111 and 48-112 (2003)), and Omaha Mun. Code, ch. 48, art. I, § 48-15 (2003), "Workmanship." At the hearing before the Board, however, the city made it clear that it lacked any evidence that these three elements violated § 303.2. Denker and Johnson admitted that the poorly painted window trim, the poor tuck-pointing, and the unpainted stucco were cosmetic issues. They asserted that such cosmetic issues violated § 48-15.

Section 48-15 states: "Repairs, maintenance work, alterations or installations which are caused directly or indirectly by the

enforcement of this code shall be executed and installed in a workmanlike manner and installed in accordance with the manufacturer's installation instructions." Denker later explained: "It's not necessarily a notice of violation, it's just that we're saying the work was done poorly and probably should have been done better and needs to be addressed."

As evidence of the exterior cracks in the north and east walls of the duplex, photographs were presented to the Board showing areas where the mortar was cracked and where the bricks lay askew. Denker explained to the Board that these cracks appeared to him to be structural and that it was his opinion that there was a possibility of partial collapse. Denker also explained that in his opinion, the loose masonry could fall onto someone walking alongside the property. The exterior cracks were stated to be "unsafe structures" in violation of Omaha Mun. Code, ch. 48, art. I, § 48-71(1) (2003), which states in part:

> An unsafe structure is one that is found to be dangerous to the life, health, property or safety of the public or the occupants of the structure by not providing minimum safeguards to protect or warn occupants in the event of fire, or because such structure contains unsafe equipment or is so damaged, decayed, dilapidated, structurally unsafe, or of such faulty construction or unstable foundation, that partial or complete collapse is possible.

The violations list, referring to § 303.6 of the IPMC, specified that the McNallys were required to obtain a structural review of the walls by a registered engineer-architect. Denker explained to the Board that the city was requiring some directive by a licensed structural engineer to opine with precision as to what the structural danger was and what needed to be done to fix it.

With regard to the two gas furnaces located in the basement of the duplex, the city argued that the furnaces fell under the definition of "unsafe structures" in § 48-71(1), for the sole reason that they had not been inspected by the city. They also were alleged to violate Omaha Mun. Code, ch. 40, art. II, § 40-106 (2003), which provides that "[t]he installation, alteration, repair or replacement of any air conditioning/air distribution system or exhaust system shall not be undertaken within the jurisdiction of the city without a permit issued by the permits and inspections

division prior to said installation." Omaha Mun. Code, ch. 40, art. II, § 40-117 (2003), similarly states: "It shall be unlawful for any person to operate any air conditioning/air distribution or ventilating system installed, altered or repaired until such systems have been inspected and approved by the permits and inspections division."

The McNallys countered with evidence that the furnaces had passed inspection by the Metropolitan Utilities District (MUD). The chief mechanical inspector with the city explained that under the Code, it is required that the city make an inspection of the furnace regardless of whether the furnace has been inspected by MUD. The inspector explained that it was not customary for the city to recognize a MUD inspection in lieu of a city inspection, and evidence was presented that each entity had different inspection criteria.

Evidence regarding the sidewalk violation showed that a portion of the sidewalk had an approximate 1-inch variance at the joint between two sections. The sidewalk was cited as being in violation of § 302.3 of the IPMC. The commentary to that section states:

> Sidewalks and driveways. All sidewalks, walkways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.
>
> . . . The code official is authorized to require that all sidewalks, walkways, stairs, driveways, parking spaces, etc., are usable and kept in proper repair. Walking surfaces that have deteriorated to a condition that presents a hazard to pedestrians must be repaired or replaced to eliminate the hazard and thus reduce the potential for accidents or injuries.

Denker explained to the Board that the sidewalk presented a tripping hazard.

At the end of the hearing, the Board voted to deny the McNallys' requests for relief as to the items described above. The McNallys appealed to the district court, which affirmed the decision of the Board. The McNallys now appeal to this court.

## III. ASSIGNMENTS OF ERROR

The McNallys assert, consolidated and restated, that the district court erred in affirming the Board's decision because (1) its determination that there were violations was not supported by competent evidence; (2) if any applicable ordinance or other provision establishes a workmanship standard based on appearance, then such provision is unconstitutional because it is vague, bears no reasonable relation to public health or safety, and is arbitrary; (3) the city lacks authority to require permits and inspections of the furnaces because Neb. Rev. Stat. § 14-815 (Reissue 1997) gives unfettered, exclusive, and paramount powers to MUD; (4) the city lacks authority to order the McNallys to obtain a structural review by a registered engineer or architect with respect to the cracked masonry in the north and east walls of the property; and (5) the Board's decision was erroneous and illegal because it was not issued in writing as required by Omaha Mun. Code, ch. 43, art. I, § 43-65 (2003).

## IV. ANALYSIS

### 1. PROPER MODE OF APPEAL

Before reaching the McNallys' assignments of error, we first consider which statute controls the McNallys' appeal. The resolution of this question determines the jurisdictional prerequisites for perfecting the appeal, as well as the applicable standard of review. The history of this case presents some confusion as to whether the appeal from the Board was brought pursuant to Neb. Rev. Stat. § 14-813 (Reissue 1997), Neb. Rev. Stat. § 25-1901 (Cum. Supp. 2006), or even the catchall provision, Neb. Rev. Stat. § 25-1937 (Reissue 1995). We conclude that the McNallys' appeal is controlled by § 25-1901.

■ Section 25-1901 states in relevant part that "[a] judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court may be reversed, vacated, or modified by the district court . . . ." Accordingly, where a board or tribunal decides no question of adjudicative fact and no statute requires it to act in a judicial manner, the orders are not "judicial" and

are not reviewable by error proceedings.[1] But, when the board or tribunal is required to conduct a hearing and receive evidence, it exercises "judicial functions" in determining questions of fact.[2]

As relevant to this case, § 43-65 of the Code, "Conduct of hearing," states in part that "[t]he board shall hear all arguments and review all evidence submitted by the applicant, the building official, and any other person(s) interested in the case, and shall render its opinion." Thus, § 43-65 required the Board to conduct a hearing and receive evidence. The Board did, in fact, receive photographs and other evidence concerning the alleged violations of the McNallys' duplex. The Board also considered the statements of Thomas McNally and of city officials before making its determination of whether violations were in fact presented. We conclude that the Board exercised "judicial functions."

While we have said that a petition in error may not be applicable where the Legislature has adopted another specific method for appeal,[3] we find that § 14-813 does not apply to the McNallys' appeal. Section 14-813 describes the mode of appeal for claims against the city that are described by Neb. Rev. Stat. § 14-804 (Reissue 1997). Claims under § 14-804 are claims filed with the city comptroller seeking monetary compensation.[4] The McNallys simply appealed a determination by the city that they were in violation of the Code. This is not a claim under § 14-804.[5]

In order to perfect a petition in error, Neb. Rev. Stat. § 25-1903 (Reissue 1995) directs the petitioner to file the petition to the district court setting forth the errors complained of.

---

[1] See, *Nicholson v. Red Willow Cty. Sch. Dist. No. 0170*, 270 Neb. 140, 699 N.W.2d 25 (2005); *Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001).

[2] See, *Douglas Cty. Bd. of Comrs. v. Civil Serv. Comm.*, 263 Neb. 544, 641 N.W.2d 55 (2002); *Abboud v. Lakeview, Inc.*, 237 Neb. 326, 466 N.W.2d 442 (1991); *Andrews v. City of Fremont*, 213 Neb. 148, 328 N.W.2d 194 (1982).

[3] See *Mogensen v. Board of Supervisors*, 268 Neb. 26, 679 N.W.2d 413 (2004).

[4] See *Schmitt v. City of Omaha*, 191 Neb. 608, 217 N.W.2d 86 (1974).

[5] See *Adams v. City of Omaha*, 179 Neb. 684, 139 N.W.2d 885 (1966).

In addition, Neb. Rev. Stat. § 25-1905 (Reissue 1995) directs the petitioner to "file with his or her petition a transcript of the proceedings or a praecipe directing the tribunal, board, or officer to prepare the transcript of the proceedings." We have held that compliance with §§ 25-1903 and 25-1905 is jurisdictional.[6] Under Neb. Rev. Stat. § 25-1931 (Cum. Supp. 2006), the filings required by §§ 25-1903 and 25-1905 must be made within "thirty days after the rendition of the judgment or making of the final order complained of."

While the parties debate whether a written order was rendered by the Board, we have repeatedly held that it is the administrative body's pronounced vote that is the final order to be appealed from, not any entry of that vote on the record.[7] The record shows that within 30 days of the Board's pronouncement, the McNallys filed with the district court a praecipe for a transcript directing the Omaha city clerk and the Board to prepare a transcript of the Board's proceedings. In *River City Life Ctr.*,[8] we explained: "After the 1991 amendment [to § 25-1905], filing of the praecipe for transcript with the clerk of the district court satisfied the 30-day appeal requirement, even if the tribunal did not timely prepare and furnish the transcript to the appellants for filing with the clerk of the district court." We determine that the jurisdictional requirements for the timely filing of a petition in error were met for the McNallys' appeal to the district court, and this court has jurisdiction over the McNallys' timely appeal from the district court.

## 2. SUFFICIENCY OF VIOLATIONS EVIDENCE

We now consider the McNallys' assignments of error. In reviewing an administrative decision on a petition in error, both

---

[6] See, e.g., *River City Life Ctr. v. Douglas Cty. Bd. of Equal.*, 265 Neb. 723, 658 N.W.2d 717 (2003).

[7] See, *McCorison v. City of Lincoln*, 218 Neb. 827, 359 N.W.2d 775 (1984); *In re Covault Freeholder Petition*, 218 Neb. 763, 359 N.W.2d 349 (1984); *Marcotte v. City of Omaha*, 196 Neb. 217, 241 N.W.2d 838 (1976); *Brown v. City of Omaha*, 179 Neb. 224, 137 N.W.2d 814 (1965).

[8] *River City Life Ctr. v. Douglas Cty. Bd. of Equal.*, supra note 6, 265 Neb. at 727, 658 N.W.2d at 721.

the district court and the appellate court review the decision of the tribunal to determine whether it acted within its jurisdiction and whether the decision of the tribunal is supported by sufficient relevant evidence.[9] The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it.[10] The interpretation of administrative regulations presents a question of law.[11]

### (a) Cracked Brick Walls

With regard to the cracked brick walls, the McNallys argue that the evidence was insufficient to support the alleged dangerous condition because the city stated only that collapse was "possible" and that this "possibility" was not based upon any specified evidence.[12] In support of this contention, the McNallys point to Denker's statement that the structural integrity of the masonry "should be evaluated by somebody that is professionally educated and trained to do so." The McNallys argue that the city essentially shifted its burden of proof to the McNallys to disprove the mere allegation of structural damage. The McNallys also argue that, regardless, the city was generally without authority to require the opinion of a structural engineer at the McNallys' expense.

The city, in contrast, asserts that the demand for a structural engineer's professional opinion was not in the context of the inspector's uncertainty that a dangerous condition existed, but only with regard to the details of how such condition should be repaired. We agree and find that the evidence was sufficient to support the Board's finding that the cracked brick walls constituted "unsafe structures" in violation of § 48-71(1).

Referring to various pictures of the exterior of the duplex, Denker explained to the Board that it was his opinion that the

---

[9] See *Barnett v. City of Scottsbluff*, 268 Neb. 555, 684 N.W.2d 553 (2004).

[10] *Id.*

[11] *Fraternal Order of Police v. County of Douglas*, 259 Neb. 822, 612 N.W.2d 483 (2000).

[12] Brief for appellants at 21.

cracks appeared structural and that there was a possibility of partial collapse. Denker further explained that the loose masonry could fall onto somebody walking alongside the property. A structural engineer was required to set forth the danger with more precision and to specify what would need to be done to fix it. The city points out that Omaha Mun. Code, ch. 48, art. I, § 48-43 (2003), provides in part:

> Whenever there is insufficient evidence of compliance with the provisions of this code, or evidence that a material or method does not conform to the requirements of this code, or in order to substantiate claims for alternative materials or methods, the code official shall have the authority to require tests to be made as evidence of compliance at no expense to the city.

As already set forth, an "unsafe structure" under § 48-71(1) of the Code includes one where "partial or complete collapse is *possible*." (Emphasis supplied.) There was sufficient relevant evidence to support a violation of § 48-71(1). We find nothing in the record to indicate that it is illegal for the city to impose the burden on the homeowner to employ the proper experts in the repair of a proven violation. The district court was thus correct in affirming the Board's decision that the cracked mortar constituted a violation under the Code and its decision to uphold the requirement for a structural review by a registered engineer or architect.

### (b) Sidewalk

We next consider the sidewalk violation. Pictures presented to the Board show that a portion of the sidewalk has an approximate 1-inch variance at the joint between two sections of the sidewalk. Denker stated that this was a tripping hazard. We find the evidence was sufficient to support the Board's finding that the sidewalk violated § 302.3 of the IPMC, because it presented a hazard to pedestrians.

### (c) Furnaces

With regard to the furnace violations, we note that the city did not allege any violation relating to the ductwork or other air distribution structural elements of the home. It construed §§ 40-106 and 40-117 of the Code to require the city inspection

of the gas furnaces connecting into those systems. Even though the furnaces were already inspected by MUD, the city points out that its furnace inspections have different elements than the MUD inspections. The McNallys argue that there was no competent evidence that the furnaces in the duplex were dangerous. They assert that there can be no violation simply on the basis of an ordinance mandating routine city inspection and permits for gas furnace installation, because any such ordinance is preempted by statutory law giving this power exclusively to MUD. We agree that there was no showing that the furnaces were dangerous and that the application of the municipal ordinance inspection and permit requirements in this case is not authorized by statute. As such, there was insufficient evidence to support a finding that the furnaces were in violation of the Code.

First, there was no showing that the gas furnaces were unsafe equipment as alleged in the violations list. Section 48-71(2) of the Code, "[u]nsafe equipment," provides that unsafe equipment includes any heating equipment "which is in such disrepair or condition that such equipment is a hazard to life, health, property or safety of the public or occupants of the premises or structure." The city inspectors admitted to the Board that since the furnaces had not been inspected, they could not affirmatively say they were dangerous. In contrast, the McNallys presented evidence that the furnaces had passed inspection by MUD.

■ Nor can a violation be premised simply in the McNallys' failure to adhere to §§ 40-106 and 40-117 insofar as the city construes these as requiring separate city inspections and permits of the furnaces. A municipality's police powers can operate only within legislative limits because the power of a municipality to enact and enforce any ordinance must be authorized by state statute.[13] The plain meaning of the applicable statutes grants to MUD exclusive authority over the routine inspection of gas furnaces. It follows that if the Legislature granted this power exclusively to MUD, then the city lacked statutory authority over the same matter.

---

[13] See, *Dean v. Yahnke*, 266 Neb. 820, 670 N.W.2d 28 (2003); *Village of Winside v. Jackson*, 250 Neb. 851, 553 N.W.2d 476 (1996).

Section 14-815, titled "Utilities district; powers and duties exclusive," states:

> Nothing in sections *14-101 to 14-138*, 14-201 to 14-229, 14-360 to 14-376, 14-501 to 14-556, 14-601 to 14-609, 14-702, 14-704, and 14-804 to 14-816 shall be construed so as to interfere with the powers, duties, authority, and privileges that are conferred and imposed upon the metropolitan utilities district as prescribed by law, but all matters relating to the powers, duties, authority, and privileges of such metropolitan utilities district so far as elsewhere conferred, imposed, and defined by law *shall be exclusive and paramount.*

(Emphasis supplied.) Elsewhere, Neb. Rev. Stat. § 14-2124 (Reissue 1997) confers upon the board of directors of a metropolitan utilities district the power to "adopt rules and regulations, in the interest of public health and safety and the conservation of gas, relating to the use, installation, and maintenance of piping, equipment, and appliances for gas on the premises of consumers." There is no dispute that pursuant to this section, MUD adopted a rule relating to permits and inspections of gas furnaces, under which the McNallys' furnaces were inspected in this case.

Absent anything to the contrary, statutory language is to be given its plain meaning, and a court will not look beyond the statute or interpret it when the meaning of its words is plain, direct, and unambiguous.[14] We cannot escape the plain language used in § 14-815 that the power, duties, authority, and privileges of a metropolitan utilities district "shall be exclusive." The term "exclusive" is defined as "excluding or not admitting other things" and "restricted or limited to the person, group, or area concerned."[15] The term has been described as precluding any idea of coexistence.[16] The use of the term "exclusive" in

[14] *DLH, Inc. v. Lancaster Cty. Bd. of Comrs.*, 264 Neb. 358, 648 N.W.2d 277 (2002).

[15] Concise Oxford American Dictionary 311 (2006).

[16] See *Desousa, et al. v. Z. H. B. Whitehall Twp.*, 19 Pa. Commw. 367, 339 A.2d 650 (1975).

§ 14-815 plainly means that the city cannot share with MUD the power granted to MUD to inspect and issue permits for gas furnaces.

The city argues that Neb. Rev. Stat. § 14-102(33) (Cum. Supp. 2006) expresses the Legislature's intent that this inspection and permitting power not be exclusive to MUD. Section 14-102(33) grants the city authority and the power to enact "[b]uilding regulations" to "prevent the dangerous construction and condition of chimneys, fireplaces, hearths, stoves, stovepipes, ovens, boilers, and *heating appliances* used in or about any building or a manufactory and to cause the same to be removed or placed in safe condition when they are considered dangerous." (Emphasis supplied.)

 Section 14-102(33) is specifically referenced by § 14-815 as not to interfere with MUD's exclusive powers. Moreover, we find that because § 14-102(33) refers to the more generic term "heating appliances," it does not create any ambiguity in the statutory scheme in which § 14-815 gives exclusive powers to MUD over the more specific realm of gas appliances and equipment. Even assuming a gas furnace could otherwise be considered a "heating appliance," to the extent that § 14-102(33) grants the city authority over "heating appliances," it does so only as to those heating appliances that are not for "gas on the premises of consumers."[17] Rules and regulations "relating to the use, installation, and maintenance of piping, equipment, and appliances for gas on the premises of consumers" are, according to the Legislature, a power "exclusive" to the metropolitan utilities districts.[18]

The city also relies on Neb. Rev. Stat. § 18-2314 (Reissue 1997) and points out that, unlike § 14-102, § 18-2314 is not listed as expressly preempted by § 14-815. This lack of specific mention in § 14-815 notwithstanding, we find nothing in the language of § 18-2314 that changes the unambiguous grant in § 14-815 of exclusive power to MUD. Section 18-2314 deals with the authority of the city to employ inspectors to work for

---

[17] § 14-2124.

[18] *Id.* See, also, § 14-815.

the "air conditioning air distribution board." It does not specifically grant the city power to inspect and permit gas furnaces, nor could it. To the extent that any of the other provisions of chapter 18, article 23, of the Nebraska Revised Statutes allow for city "furnace" inspectors, they do not specify "gas" furnaces. The provisions of chapter 18, article 23, must likewise be read in conjunction with the plain mandate of § 14-815, making "exclusive" the power granted to MUD in sections such as § 14-2124.

### (d) Stucco, Tuck-Pointing, and Window Paint

Finally, we address the three cosmetic issues found by the Board to be in violation of the workmanlike manner of § 48-15. Because Denker and Johnson admitted to the Board that these aspects of the duplex were really appearance issues and that they had never inspected them closely enough to know if there were any protective treatment violations, there is clearly insufficient evidence that these items were in any other way unsafe, unfit, or unlawful under the Code.

Section 48-15 states: "Repairs, maintenance work, alterations or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner and installed in accordance with the manufacturer's installation instructions." Workmanlike is defined elsewhere in the commentary to the IPMC as:

> Executed in a skilled manner; e.g., generally plumb, level, square, in line, undamaged and without marring adjacent work.
>
> . . . To be workmanlike, maintenance or repair work must be performed in a manner consistent with work done by a skilled craftsman. In general, floors should be level, walls plumb and square, and windows installed so that they operate easily and fit within the rough opening to exclude the elements. The use of proper tools, methods, and materials is usually necessary for workmanlike repairs.

Whether or not the unattractiveness of the repairs could fall under this definition of "workmanlike," the McNallys argue that § 48-15 is inapplicable. The McNallys point out that none of the items were "caused directly or indirectly by the enforcement of

this code."[19] Instead, the window trim painting, the stucco, and the tuck-pointing were repairs which the McNallys conducted on their own accord. We agree that § 48-15 is inapplicable in this case because the ordinance clearly limits the "workmanlike" mandate to situations where the work is conducted pursuant to enforcement of the Code.

The McNallys also argue that if § 48-15 were interpreted to mean that the city could pass out violations notices for "unworkmanlike" repairs done on the owner's own accord when there is no danger presented by the repairs, then the ordinance would be unconstitutional. Having already determined that § 48-15 does not in fact grant such authority and that no violation was shown as to these items, we do not reach this issue.

### (e) Failure to Render Decision in Writing

The McNallys assign as error that the Board failed to render a decision in writing. This, argue the McNallys, was contrary to § 43-65 of the Code, and therefore, its decision is void. Because the record contains a copy of the minutes reflecting the Board's decision at the hearing, we find no merit to this argument.

### V. CONCLUSION

We affirm the district court's decision with regard to the cracked exterior walls and the upheaved sidewalk as being in violation of the Code. We reverse the district court's decision as to the violations stemming from the unpainted stucco, the poorly painted window, the unsightly tuck-pointing, and the furnaces.

AFFIRMED IN PART, AND IN PART REVERSED.

WRIGHT, J., not participating.

---

[19] Brief for appellants at 27.