Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/03/2025 09:08 AM CDT

Marjorie Johnson, appellant, v.
Village of Polk, appellee.
___ N.W.3d ___

Filed July 3, 2025.    No. S-24-693.

1.  **Statutes: Appeal and Error.** Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.
2.  **Appeal and Error.** An issue not presented to or decided by the trial court is not appropriate for consideration on appeal.
3.  **Municipal Corporations: Statutes: Legislature.** Municipal corporations can exercise only such powers as the Legislature has granted, and statutes granting powers to municipalities are to be strictly construed.
4.  **Municipal Corporations: Words and Phrases.** Under what is commonly referred to as "Dillon's Rule," non-home-rule municipal corporations possess and can exercise only (1) those powers granted in express terms; (2) those powers necessarily or fairly implied in, or incidental to, the powers expressly granted; and (3) those powers essential to the declared objects and purposes of the municipality, not merely convenient, but indispensable.
5.  **Appeal and Error.** Appellate courts do not consider arguments and theories raised for the first time on appeal.
6.  **Municipal Corporations: Statutes.** In considering the powers conferred to a municipality by statute, courts utilize the intrinsic aid of the in pari materia doctrine, reading all statutes upon the same general subject matter as part of one system and later statutes as supplementary or complementary to those preceding them.
7.  **Statutes.** Even under strict construction, courts do not read into statutes words that are not there.
8.  **Statutes: Ordinances.** Preemption of municipal ordinances by state law is based on the fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state.

9. ____: ____. State preemption arises with respect to municipal ordinances or township laws and flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, state law.

10. **Courts: Statutes: Ordinances.** When a court considers preemption claims, it is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject.

11. **Municipal Corporations: Statutes: Legislature: Intent.** There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption, although the three categories are not analytically air-tight. In all three cases, the touchstone of preemption analysis is legislative intent.

12. ____: ____: ____: ____. Field preemption and conflict preemption arise in situations where the Legislature did not explicitly express its intent to preempt local laws, but such can be inferred from other circumstances.

13. ____: ____: ____: ____. In conflict preemption, legislative intent to preempt local laws is inferred to the extent that a local law actually conflicts with state law.

14. **Ordinances: Legislature: Statutes.** An ordinance cannot prohibit what the Legislature has expressly licensed, authorized, or permitted. Conversely, without express legislative grant, an ordinance cannot authorize what the statutes forbid.

15. **Ordinances: Statutes.** A city ordinance is inconsistent with a statute if it is contradictory in a sense that the two legislative provisions cannot coexist.

16. **Municipal Corporations: Statutes: Legislature: Intent.** In field preemption, legislative intent to preempt local laws is inferred from a comprehensive scheme of legislation.

17. ____: ____: ____: ____. The mere fact that the Legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted.

18. **Statutes.** Courts must read the provisions of any act or any number of acts so that they are harmonized, if possible, and so construed as to give some effect to every part.

Appeal from the District Court for Polk County: RACHEL A. DAUGHERTY, Judge. Affirmed in part, and in part dismissed.

Jared J. Krejci, of Smith, Johnson, Allen, Connick & Hansen, for appellant.

No appearance by appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Freudenberg, J.

## INTRODUCTION

An owner of farmland who was denied a permit by a village to drill a new well for purposes of irrigating her farmland appeals from the denial of a declaratory judgment that an ordinance requiring a permit for new wells in the village's wellhead protection area was invalid on its face or as applied. She argues the ordinance requiring a permit from the village's board of trustees to drill private water wells within the wellhead protection area of the village's public water source, which was established in cooperation with the Department of Environment and Energy pursuant to the Wellhead Protection Area Act, Neb. Rev. Stat. §§ 46-1501 to 46-1509 (Reissue 2021), is facially invalid as preempted by the Nebraska Ground Water Management and Protection Act (NGWMPA), Neb. Rev. Stat. §§ 46-701 to 46-756 (Reissue 2021), which gives local natural resources districts (NRDs) powers to issue permits for new wells. Additionally, she argues that the ordinance as applied to her preexisting farming operation located within the village's wellhead protection area violates Neb. Rev. Stat. § 17-1001(3) (Reissue 2022), because it interferes with the conduct of existing farming. We affirm.

## BACKGROUND

After Marjorie Johnson (Marjorie) obtained a permit by the governing Upper Big Blue natural resources district (Upper Big Blue NRD) to drill a well on her farmland that had been historically irrigated through an agreement to share a well located on a neighboring farm, the Village of Polk (Polk) informed her that, pursuant to Polk's ordinance No. 328 (Ordinance No. 328), she also must obtain a permit from Polk's board of trustees (Village Board) to legally drill the well. When the Village Board denied her application for a permit to drill the well, she commenced this action in district court.

### Complaint

In her complaint, Marjorie sought a declaratory judgment that Ordinance No. 328 is illegal and facially invalid or invalid as applied because it is preempted by the NGWMPA and the regulations enacted by the Upper Big Blue NRD under the authority granted by the NGWMPA; exceeds Polk's extraterritorial zoning jurisdiction granted by § 17-1001(3), because it prohibits, prevents, or interferes with her existing farming operations; exceeds the authority granted to villages by the State of Nebraska; and was not properly enacted under the Wellhead Protection Area Act.

Alternatively, based on the same challenges to Ordinance No. 328, Marjorie alleged in her complaint that she was filing a petition in error challenging the Village Board's decision. The record does not reflect a notice of appeal or request for a transcript from the Village Board. At a pretrial hearing, Marjorie stated her belief that the correct way to challenge the ordinance was through the declaratory judgment action, but clarified she "included the petition-in-error part as a fall back in case [she] was wrong about that."

### Evidence at Trial

The evidence adduced at the trial on the declaratory judgment action showed that Marjorie has 80 acres of farmland that was purchased together with her late husband. The land was farmed as irrigated farmland for at least 22 years until 2023. The land was irrigated through an agreement that Marjorie and her late husband made with their neighbor.

After the death of Marjorie's husband, Marjorie informed the neighbor she was going to lease her and her late husband's land to someone else. Soon thereafter, the neighbor cut off all contact with Marjorie and she "assumed [she] lost [the right to use] the well" on the neighbor's land. Rather than "fight over" the right to use that well, she decided to apply for permission to construct a new well.

Marjorie applied for a permit with the Upper Big Blue NRD. In October 2023, the Upper Big Blue NRD approved the application and granted a permit to construct a new water well for center-pivot farm irrigation in the Upper Big Blue NRD groundwater management area. The Upper Big Blue NRD covers Polk County, Nebraska. The permit states, "Issuance of this permit DOES NOT imply that the proposed well complies with Federal, State or Local requirements."

An employee of Polk informed Marjorie she also had to obtain a permit from the Village Board, because the well would be located within 1 mile of the corporate limits of Polk County and within Polk's "Wellhead Protection Area." Introduced into evidence at trial is a map drawn by the then Department of Environmental Quality pursuant to its wellhead protection program, showing that Marjorie's land is located in Polk's wellhead protection area. Also in evidence is a letter from the Director of Environmental Quality in 2014, approving Polk's wellhead protection plan.

Marjorie applied for a permit pursuant to local Ordinance No. 328, which generally provides that any person who wishes to drill a water well located within Polk's wellhead protection area must obtain a permit from the Village Board, which can approve the application only if it determines the water well will not cause contaminants to enter the public water supply. In November 2023, a meeting was held before the Village Board to consider the application. The Village Board voted to deny the permit.

According to the testimony of Darold Carlstrom, chairperson of the Village Board, there was no specific scientific data considered during the meeting. However, the proposed well fell within Polk's wellhead protection area, which shows that the aquifer supplying water for Polk's waterworks flows from the site of Marjorie's proposed water well. Carlstrom indicated there was concern that an additional well in that area could increase the levels of nitrates in Polk's drinking water. He explained that nitrates in Polk's water supply had already

been a problem, which was addressed by building a new water tower that blended water from two wells. Polk would not be able to afford a treatment plant, potentially required if nitrates rose higher. Thus, the Village Board did not think it was in Polk residents' best long-term interests to add another well in the wellhead protection area. Carlstrom admitted that Marjorie would be extracting the same amount of water as she had been extracting from the shared well.

In April 2024, a tenant began leasing and farming Marjorie's land as dryland. Because the land is nonirrigated, the income from the crops was diminished and Marjorie has lost lease income and property value.

Marjorie argued Ordinance No. 328 was invalid because of field preemption of the NGWMPA, which provides that the various local NRDs shall regulate water wells across the state and shall grant permits for drilling new water wells consistent with the policies of the NGWMPA. She also asserted that Ordinance No. 328 directly conflicts with the mandate of § 46-738 of the NGWMPA that "[w]hen any permit is approved pursuant to section 46-736, the applicant shall commence construction as soon as possible after the date of approval and shall complete the construction and equip the water well prior to the date specified in the conditions of approval . . . ," as well as the regulations of the Upper Big Blue NRD defining a "permit" as "a document obtained, in accordance with the [NGWMPA] and these rules and regulations, authorizing the construction or modification of a water well or its use." Lastly, characterizing Ordinance No. 328 as "an extraterritorial zoning ordinance," Marjorie argued that regardless of preemption, Ordinance No. 328 as applied violated § 17-1001(3) by being an extraterritorial zoning ordinance that interfered with or prevented an existing farming operation.

Marjorie disagreed with Polk's argument that the ordinance was pursuant to the Legislature's grant in Neb. Rev. Stat. §§ 17-536 and 17-537 (Reissue 2022) of jurisdiction to pass and enforce necessary rules to prevent pollution of

or injury to the source of water for the supply of the village waterworks. Marjorie argued that, strictly construing the grant and ensuring it did not conflict with the NGWMPA, the Legislature did not confer upon cities and villages of the second class the power to regulate privately owned water wells but conferred the more limited authority to protect municipal water sources from direct attacks. Marjorie did not address whether the Wellhead Protection Area Act granted authority to pass Ordinance No. 328.

The district court denied the request for declaratory judgment and the "[p]etition in [e]rror." Harmonizing the NGWMPA with §§ 17-536, 17-537, and 17-1001(3), the court determined the Legislature had given both the local NRDs and municipalities control over the water supplying municipalities' waterworks, and it found no conflict preemption by virtue of the different permit decisions by the Upper Big Blue NRD and Polk. Finally, the court found Ordinance No. 328 did not violate § 17-1001(3) as applied, because the land was previously irrigated by virtue of an agreement with a neighbor and it was "the dispute between neighbors as a result of [Marjorie's] business decision that resulted in [her] land being dry land and not irrigated, not the actions of the ordinance."

The court stated with respect to the petition in error that it was difficult to discern whether the Village Board was acting in a quasi-legislative or quasi-judicial capacity. Assuming arguendo that there was jurisdiction over the petition in error, the court found the Village Board's decision was not arbitrary or capricious.

## ASSIGNMENTS OF ERROR

Marjorie assigns that the district court erred in determining that (1) Ordinance No. 328 was not preempted, facially or as applied, by the NGWMPA; (2) Ordinance No. 328 was not preempted, facially or as applied, by the Upper Big Blue NRD's regulations; (3) as applied, Ordinance No. 328 did not exceed the authority given to villages by § 17-1001; and (4) Polk had statutory authority to enact Ordinance No. 328.

## STANDARD OF REVIEW

[1] Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.[1]

[2] An issue not presented to or decided by the trial court is not appropriate for consideration on appeal.[2]

## ANALYSIS

Before us is the district court's decision denying Marjorie's request for declaratory judgment. Marjorie failed to perfect a petition in error to the district court because she did not comply with the jurisdictional prerequisite of Neb. Rev. Stat. § 25-1905 (Reissue 2016) of filing, with the petition in error, a transcript of the quasi-judicial proceedings or praecipe directing the tribunal, board, or officer to prepare the transcript of the proceedings.[3] Therefore, the district court lacked jurisdiction over the petition in error, and where a lower court lacks jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.[4] Therefore, this part of the appeal must be dismissed.

Marjorie does not argue on appeal that the Village Board's decision that the proposed well posed a risk to Polk's drinking water system was arbitrary and capricious, a challenge which, in any event, is brought on petition in error. We limit our review to whether the district court, following trial, should have issued a declaratory judgment that the permit requirement of Ordinance No. 328 is facially invalid or

---

[1] *Fitzke v. City of Hastings*, 255 Neb. 46, 582 N.W.2d 301 (1998).

[2] *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003).

[3] See, *McNally v. City of Omaha*, 273 Neb. 558, 731 N.W.2d 573 (2007); *Cole v. Kilgore*, 241 Neb. 620, 489 N.W.2d 843 (1992). See, also, e.g., *Meints v. City of Beatrice*, 20 Neb. App. 129, 820 N.W.2d 90 (2012).

[4] *Muller v. Weeder*, 313 Neb. 639, 986 N.W.2d 38 (2023).

invalid as applied to Marjorie's existing farming operation. Marjorie argues that the ordinance was passed without statutory authority, that it is preempted by the NGWMPA, and that it violates § 17-1001 because it interferes with the conduct of existing farming.

ORDINANCE

Ordinance No. 328 sets forth that its purpose is "to describe the area surrounding the existing and future municipal water wells to be protected" and locate "potential sources of [pollution] or injury to the municipal water supply." It then gives a metes and bounds description of Polk's "Wellhead Protection Area consisting of the following area in which there exists the need of regulations regarding the location of existing and future potential sources of pollution or injury to the public water supply." Also attached is a map showing the wellhead protection area. The wellhead protection area does not extend more than 1 mile beyond the corporate limits of Polk.

Section 3 of the ordinance provides that "[i]t shall be unlawful for any person to place, construct, or replace any of the following structures . . . within the Wellhead Protection Area, except as may be provided herein: DRILLING AND OPERATION OF WELLS . . . WITHOUT PERMIT IS UNLAWFUL." Section 3 also gives the procedure to obtain a permit by completing and submitting an application to the Polk village clerk. Section 4 of the ordinance provides, "The placing, constructing or replacing of any structure or activity as set forth in Section 3 of this Ordinance shall not be permitted, after the effective date of this Ordinance, unless a permit approved by the Village Board . . . has been obtained." Section 5 states that "[t]he Chairman and [Village] Board . . . may approve the placement, construction or replacement of a Section 3 Structure or Activity within the Wellhead Protection Area only if the [Village] Board determines that such placement, construction or replacement will not cause contaminants to enter the public water supply."

### STATUTORY GRANT OF AUTHORITY

[3,4] First, we find that Ordinance No. 328 was passed under the necessary statutory grant of power to the municipality. Municipal corporations can exercise only such powers as the Legislature has granted,[5] and statutes granting powers to municipalities are to be strictly construed.[6] Under what is commonly referred to as "Dillon's Rule," non-home-rule municipal corporations possess and can exercise only (1) those powers granted in express terms; (2) those powers necessarily or fairly implied in, or incidental to, the powers expressly granted; and (3) those powers essential to the declared objects and purposes of the municipality, not merely convenient, but indispensable.[7]

The Wellhead Protection Area Act expressly grants, to villages and other "[c]ontrolling entit[ies],"[8] the power to "designate a wellhead protection area and *adopt controls* pursuant to the Wellhead Protection Area Act for the purpose of protecting the public water supply system**.**"[9] A "controlling entity" is defined § 46-1502(1) as

> a city, a village, a natural resources district, a rural water district, any other entity, including, but not limited to, a privately owned public water supply system, or any combination thereof operating under an agreement pursuant to the Interlocal Cooperation Act or the Joint Public Agency Act that operates a public water supply system.

---

[5] *Dawson County v. Clark*, 58 Neb. 756, 79 N.W. 822 (1899).

[6] *Fitzke v. City of Hastings, supra* note 1. See, also, e.g. *Chicago, St. P., M. & O. Ry. Co. v. City of Randolph*, 163 Neb. 687, 81 N.W.2d 159 (1957).

[7] See, *Home Builders Assn. v. City of Lincoln*, 271 Neb. 353, 711 N.W.2d 871 (2006); *In re Application of Lincoln Electric System*, 265 Neb. 70, 655 N.W.2d 363 (2003); 2 Eugene McQuillin, The Law of Municipal Corporations § 4:11 (3d ed. 2025); 2A Eugene McQuillin, The Law of Municipal Corporations § 10:10 (3d ed. 2017).

[8] § 46-1502(1).

[9] § 46-1503 (emphasis supplied).

A "[w]ellhead protection area" is defined by § 46-1502(4) as "the surface and subsurface area surrounding a water well or well field, supplying a public water system, through which contaminants are reasonably likely to move toward and reach such water well or well field." Under the procedures for designating a wellhead protection area and its controls pursuant to § 46-1504, the wellhead protection area is "based on all reasonably available hydrogeologic information on ground water flow, recharge, and discharge and other related information" and identification "within each proposed wellhead protection area [of] all potential sources of contaminants which may have any adverse effect on the health of persons." The controls are "to provide protection from contaminants which may have any adverse effect on the health of persons served by the public water supply system of each participating controlling entity."[10]

The boundaries of the wellhead protection area and the controls necessary to protect the water in the wellhead protection area are approved by the Director of Environment and Energy before they become effective.[11] "Such approval shall be based on whether the boundaries of the wellhead protection area are reasonably defined, the controls are reasonably related to the purpose of ground water protection in the area, and such approval is in the public interest."[12]

Under a different series of statutes generally governing the powers of cities of the second class and villages, § 17-536 expressly grants to a village, such as Polk, jurisdiction extending 15 miles beyond its corporate limits to prevent any pollution of or injury to the source of water for the supply of waterworks. It states in full:

The jurisdiction of a city of the second class or village to prevent any pollution or injury to the stream or

_____

[10] § 46-1504(5).

[11] § 46-1506; § 46-1502(3).

[12] § 46-1506.

source of water for the supply of waterworks constructed under sections 17-530 to 17-532 shall extend fifteen miles beyond its corporate limits.[13]

Section 17-537, in turn, expressly grants to the Village Board the power to make and enforce all necessary rules in the management of its waterworks:

> The city council of a city of the second class or village board of trustees shall have power to make and enforce all necessary rules and regulations in the construction, use, and management of waterworks, mains, portion, or extension of any system of waterworks or water supply and for the use of the water from such system.

Other provisions involving village public waterworks grant the power to make contracts with and authorize persons or entities to erect and maintain a municipal system of waterworks and water supply[14] and the power of the cities of the second class and villages to require persons and entities operating any public water supply to connect with and furnish water to the city or village from its mains.[15]

Section 17-1001, which is not specific to public water source protection, generally extends the extraterritorial jurisdiction of a village 1 mile beyond its corporate boundaries for zoning regulations, property use regulations, and building ordinances, among other things. Section 17-1001(3) states in part:

> Any city of the second class or village may apply by ordinance any existing or future zoning regulations, property use regulations, building ordinances, electrical ordinances, and plumbing ordinances within its extraterritorial zoning jurisdiction, with the same force and effect as if such area was within its corporate limits.

[5] Marjorie does not allege Polk's wellhead protection area and its controls were improperly designated under the

---

[13] § 17-536 (emphasis supplied).

[14] Neb. Rev. Stat. § 17-530 (Reissue 2022).

[15] Neb. Rev. Stat. § 17-532 (Reissue 2022).

procedures set forth in the Wellhead Protection Area Act, and the record indicates otherwise. Instead, Marjorie argues, for the first time on appeal, that the ordinance was not enacted in accordance with a comprehensive development plan as required by Neb. Rev. Stat. §§ 19-901 to 19-903 (Reissue 2022) for a "zoning ordinance." At the same time, she asserts Ordinance No. 328 is not a "zoning ordinance," and, thus, could not have been adopted pursuant to the powers conferred by § 17-1001, a position seemingly at odds with her argument that the ordinance violated § 17-1001(3) being asserted for the first time on appeal. We do not consider arguments and theories raised for the first time on appeal.[16]

[6] In considering the powers conferred to a municipality by statute, we utilize the "intrinsic aid" of the in pari materia doctrine, reading all statutes upon the same general subject matter as part of one system and later statutes as supplementary or complementary to those preceding them.[17] When there is a conflict between two statutes on the same subject, the specific statute controls over the general.[18] We do not find a conflict between the above statutes. We find that in pari materia, the statutes expressly grant a village, such as Polk, the geographically limited extraterritorial jurisdiction to make and enforce rules in the management of its water supply for its waterworks and to adopt controls over a designated wellhead protection area for the purpose of protecting the public water supply system.

Ordinance No. 328 requires a permit from the Village Board for drilling new wells within the wellhead protection area for Polk's municipal water supply. Said wellhead protection area lies within both the general 1-mile extraterritorial jurisdiction of § 17-1001 and the 15-mile extraterritorial jurisdiction

---

[16] *In re Estate of Adelung*, 306 Neb. 646, 947 N.W.2d 269 (2020).

[17] See *State v. Albarenga*, 313 Neb. 72, 87, 982 N.W.2d 799, 812 (2022).

[18] *Wilkinson Development v. Ford & Ford Investments*, 311 Neb. 476, 973 N.W.2d 349 (2022).

under §§ 17-536 and 17-537 of Polk to prevent any pollution of or injury to the stream or source of water for the supply of its waterworks.

Nevertheless, Marjorie argues that because the above statutes do not expressly authorize a village to require permits from the village board for well drilling on private property, under a strict construction of the grant of authority, Polk has only the power to "directly prevent pollution or injury to municipal water sources."[19] She illustrates her understanding of "directly prevent pollution" as criminalizing vandalism or intentional poisoning of water sources for municipal waterworks. She states that, beyond that, "clear authority starts to run out."[20]

[7] None of the statutes before us conferring powers to Polk are specific in the objects of the controls or rules authorized. Instead, they specifically define the purpose of the controls. Even under strict construction, we do not read into statutes words that are not there.[21] Thus, we will not read into these statutes a "directly prevent" requirement.

Ordinance No. 328 was properly enacted pursuant to powers incident to those expressly granted by statute through the relevant statutory provisions of the Wellhead Protection Area Act read together with §§ 17-536 and 17-537. We find no merit to Marjorie's contention that the ordinance was adopted without statutory authority. We turn next to whether Ordinance No. 328 was preempted by the NGWMPA.

Field and Conflict Preemption

[8-10] Preemption of municipal ordinances by state law is based on the fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the

---

[19] Brief for appellant at 17.

[20] *Id*.

[21] See *Stewart v. Nebraska Dept. of Rev.*, 294 Neb. 1010, 885 N.W.2d 723 (2016).

state.[22] State preemption arises with respect to municipal ordinances or township laws and flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, state law.[23] When a court considers preemption claims, it is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject.[24]

[11] There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption, although the three categories are not "analytically air-tight."[25] In all three cases, the touchstone of preemption analysis is legislative intent.[26] The central question in a preemption case is not whether the Legislature intended to grant authority to municipalities to act concerning a particular matter, but, rather, whether the Legislature intended to deny municipalities the right to legislate on the subject.[27]

[12] Marjorie does not argue express preemption. She argues field preemption and conflict preemption. Field preemption and conflict preemption arise in situations where the Legislature did not explicitly express its intent to preempt local laws, but such can be inferred from other circumstances.[28]

[13-15] In conflict preemption, legislative intent to preempt local laws is inferred to the extent that a local law actually conflicts with state law.[29] Generally, an ordinance cannot prohibit what the Legislature has expressly licensed, authorized,

---

[22] *State v. Albarenga, supra* note 17.

[23] *Id*.

[24] See *Malone v. City of Omaha*, 294 Neb. 516, 883 N.W.2d 320 (2016).

[25] *State v. Albarenga, supra* note 17, 313 Neb. at 84, 982 N.W.2d at 810 (internal quotation marks omitted).

[26] *State v. Albarenga*, *supra* note 17.

[27] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2.

[28] *Hauptman, O'Brien v. Auto-Owners Ins. Co.*, 310 Neb. 147, 964 N.W.2d 264 (2021).

[29] *Id*.

or permitted.[30] Conversely, without express legislative grant, an ordinance cannot authorize what the statutes forbid.[31] A city ordinance is inconsistent with a statute if it is contradictory in a sense that the two legislative provisions cannot coexist.[32]

[16,17] In field preemption, legislative intent to preempt local laws is inferred from a comprehensive scheme of legislation.[33] However, the mere fact that the Legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted.[34]

Two cases involving the question of preemption by Nebraska's Environmental Protection Act (NEPA)[35] over municipal ordinances of pollution control, *State ex rel. City of Alma v. Furnas Cty. Farms*[36] and *Sarpy County v. City of Springfield*,[37] are instructive to the case at bar.

*Sarpy County* involved a dispute between a city of the second class and a county over the county's construction of a solid waste disposal facility 1½ miles outside the city limits and, thus, outside the city's extraterritorial zoning jurisdiction described by § 17-1001. By statute,[38] the county was given the power to construct solid waste disposal facilities. The county refused to apply for a permit with the city as required by city ordinance for the construction of a solid waste disposal facility within 5 miles of the city limits if the waste disposal area would be located over a ground water source that supplied drinking water to the city residents.

---

[30] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2.

[31] *Id*.

[32] *Id*.

[33] *Hauptman, O'Brien v. Auto-Owners Ins. Co., supra* note 28.

[34] *Id*.

[35] Neb. Rev. Stat. §§ 81-1501 to 81-1532 (Reissue 2024).

[36] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2.

[37] *Sarpy County v. City of Springfield*, 241 Neb. 978, 492 N.W.2d 566 (1992).

[38] Neb. Rev. Stat. § 23-379 (Reissue 1991).

The county relied on a NEPA statute expressly stating that before the then Director of Environmental Quality shall approve a new solid waste disposal area outside the zoning jurisdiction of a city or village, it shall be approved by the county board; whereas before the director shall approve a new solid waste disposal area inside the zoning jurisdiction of a city or village, it shall be approved by the city council or village board of trustees.[39]

We agreed that this provision of NEPA on its face granted to the county, rather than to the city, the authority to approve the county's proposed waste disposal area that was outside the city's extraterritorial zoning jurisdiction as defined by § 17-1001. While we observed that other provisions in NEPA referred to local ordinances, we reasoned that those provisions must be read in light of the express provision of NEPA as to when the city, as opposed to the county board, must also approve a new solid waste disposal area. We also recognized that § 17-536 grants jurisdiction to a city, extending 15 miles beyond its corporate limits, to prevent pollution of or injury to the source of water for the supply of its waterworks. However, strictly construing § 17-536 and reading it in pari materia with the specific and express provision of NEPA requiring approval by the county, rather than by the city, when the facility is outside the city's 1-mile extraterritorial zoning jurisdiction, we found the ordinance to be invalid as applied.

*State ex rel. City of Alma* involved a dispute between a city and a private company constructing a large swine facility with three solid and liquid waste lagoons, located approximately 8 miles outside the city limits.[40] The company refused to comply with city ordinances governing livestock or other facilities that create liquid or solid waste within 15 miles of the city limits, and the city brought action for declaratory judgment and injunctive relief. The company asserted that the

---

[39] *Id*.

[40] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2.

ordinances were preempted because NEPA took precedence over § 17-536 and that the City had no authority to prohibit the erection of the swine facility through its regulations if the Department of Environmental Quality issued a permit allowing it. The lower court declared the ordinances valid and granted an injunction.

The city ordinances required application for a permit, submission of a plan, compliance with the requirements imposed by the Department of Environmental Quality, compliance with additional environmental protections enumerated by ordinance, and submission of a bond or financial guarantee that the waste containment facilities would be closed in accordance with applicable laws and regulations. The additional controls imposed by city ordinance pertained to ground water protection.

We affirmed in part and reversed in part. We held that the ordinances challenged by the livestock farm were not preempted by NEPA, with the exception of the ordinance setting forth a bond requirement that was subject to conflict preemption.

Despite NEPA's conferral of substantial authority upon the Department of Environmental Quality to exercise "exclusive general supervision of the administration and enforcement of [NEPA], the Integrated Solid Waste Management Act, [and] the Livestock Waste Management Act"; the power to require the submission of plans and issue permits or approvals as required under those three acts; and the ability to "exercise all incidental powers,"[41] we rejected the company's argument that NEPA demonstrated field preemption and that it took precedence over the powers conferred to the city through § 17-536 to protect its public water supply. We observed that other provisions of NEPA described the Department of Environmental Quality's power to "encourage local units of government to handle . . . pollution problems within their respective

---

[41] § 81-1504.

jurisdictions and on a cooperative basis"[42]; that nothing in consultations for proposed installations "'shall be construed to relieve any person from compliance with . . . rules and regulations in force pursuant to the acts, *or any other provision of law*'"[43]; and that a livestock operation "is not a nuisance if . . . [i]t is in compliance with applicable regulations adopted by the council and zoning regulations of the local governing body having jurisdiction."[44] Reading the statutory scheme as a whole, we said, "[I]t is clear that the Legislature contemplated that municipalities would continue to enact ordinances on the subject of pollution control after the enactment of the NEPA."[45]

We found the ordinance and the applicable law in *Sarpy County* distinguishable.[46] Our holding in *Sarpy County*, we explained, was specifically limited to the application of the then-existing provisions of NEPA to solid waste disposal areas, which expressly limited the requirement of city council approval to disposal areas within a city or village's 1-mile zoning jurisdiction. We pointed out that NEPA does not have a similar provision limiting the authority of a city or village to regulate a livestock confinement facility utilizing solid and liquid waste storage lagoons.

However, we held that conflict preemption invalidated the provision of a city ordinance that, without exception, required an applicant for a permit to operate a livestock facility creating liquid or solid waste to submit a bond or financial guarantee to ensure waste containment facilities are closed in accordance with applicable laws and regulations. The bond

---

[42] § 81-1504(18).

[43] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2, 266 Neb. at 572, 667 N.W.2d at 524, quoting § 81-1504.

[44] § 81-1506(1)(b).

[45] *State ex rel. City of Alma v. Furnas Cty. Farms,* supra note 2, 266 Neb. at 572, 667 N.W.2d at 524-25.

[46] See *Sarpy County v. City of Springfield, supra* note 37.

statute under NEPA expressly provided that the Environmental
Quality Council may exempt classes of permittees or licensees
from the requirement of a financial guarantee when there is
no significant risk to public health and welfare.[47] We therefore
held that the subject provision of the ordinance, by not allow-
ing exceptions to the financial guarantee requirement, in effect
prohibited what state law expressly allowed.

Similarly to NEPA's conferral of powers to the Department
of Environmental Quality and, since July 2019, to the Depart-
ment of Environment and Energy, the NGWMPA gives local
NRDs legal authority to regulate ground water management,
including granting permits for new water wells. The local
NRDs are the "preferred regulators of activities which may
contribute to ground water contamination in both urban and
rural areas"[48] and are the "preferred regulators of activities
which may contribute to ground water depletion,"[49] "except as
otherwise specifically provided by statute."[50]

Section 46-735(1) states that "[a]ny person who intends
to construct a water well in a management area in this state
. . . shall . . . apply [for a permit] with the district in which
the water well will be located." Section 46-738 states that the
"applicant shall commence construction" "[w]hen any permit
is approved":

> When any permit is approved pursuant to section
> 46-736, the applicant shall commence construction as
> soon as possible after the date of approval and shall com-
> plete the construction and equip the water well prior to
> the date specified in the conditions of approval, which
> date shall be not more than one year after the date of
> approval, unless it is clearly demonstrated in the appli-
> cation that one year is an insufficient period of time for

---

[47] See § 81-1505(21)(a).

[48] § 46-704(4).

[49] § 46-702.

[50] *Id*.

such construction. If the applicant fails to complete the project under the terms of the permit, the district may withdraw the permit.

Section 46-706(5) includes, under the definition of "[i]llegal water well," one constructed or operated without or in violation of a permit required by the NGWMPA, one in violation of NRD regulations, or one in violation of other state laws or regulations promulgated pursuant to those laws.

The NGWMPA does not expressly state that the local NRDs are the only regulators of the activities therein described. To the contrary, besides generally referring to other statutory law, § 46-704 of the NGWMPA expressly acknowledges the authority of the Department of Environment and Energy to regulate sources of ground water contamination. Section 46-705 states in part, "Nothing in the [NGWMPA] relating to the contamination of ground water is intended to limit the powers of the Department of Environment and Energy provided in Chapter 81, article 15." We note that 2025 Neb. Laws, L.B. 317, passed on May 6, 2025, provided that on or after July 1, 2025, the Department of Natural Resources shall be merged into the Department of Environment and Energy, which will be renamed the Department of Water, Energy, and Environment.

[18] Like the provisions of any act or any number of acts, we must read the statutes of the NGWMPA in pari materia with each other and with statutes on the same subject so that they are harmonized, if possible, while so construed as to give some effect to every part.[51] The comprehensive scheme at issue in determining whether field preemption invalidates Ordinance No. 328 includes the Wellhead Protection Area Act and the other statutes already discussed. The touchstone of preemption analysis is legislative intent, and we must determine the purpose and intent of the Legislature from all the relevant statutes.

---

[51] See, *A & P II v. Lancaster Cty. Bd. of Equal.*, 316 Neb. 216, 3 N.W.3d 907 (2024); *State, ex rel. Rohrs, v. Harris*, 100 Neb. 745, 161 N.W. 253 (1917); *The People, ex rel., v. Weston, Auditor*, 3 Neb. 312 (1874).

As illustrated in *State ex rel. City of Alma* with respect to NEPA, the extensiveness of the NRDs' jurisdiction over activities that may contribute to ground water depletion or contamination does not by itself establish local NRDs as the only entities permitted to control those activities.[52] While the NGWMPA may not refer to local authority in exactly the same manner NEPA does, both the Wellhead Protection Area Act and §§ 17-536 and 17-537 specifically grant to villages, as "controlling entities," the power to adopt, with technical assistance by the Department of Environment and Energy, controls to protect the sources of water for municipal water supplies. And expressly, the NGWMPA does not limit the powers of the Department of Environment and Energy, with which Polk developed its wellhead protection plan and under which the Village Board was implementing its permit decisions.

As illustrated in *State ex rel. City of Alma*, an applicant for an activity within the territory of two different regulatory bodies may properly be required to obtain a permit from both. Permit schemes are not irreconcilable simply because one imposes requirements that are stricter than the other.[53] As always, the real question is one of legislative intent. It appears the Legislature intends local NRDs to have a broader territorial jurisdiction and mandate that is compatible with the controls of the smaller wellhead protection area, developed in cooperation with the Department of Environment and Energy and specific to the protection of a village or city's water supply. Both entities can, under circumstances such as these, require permits for drilling the same well.

---

[52] *State ex rel. City of Alma v. Furnas Cty. Farms, supra* note 2.

[53] See, *State v. Dupier*, 118 P.3d 1039 (Alaska 2005); *Chamber of Commerce v. City of Minneapolis*, 944 N.W.2d 441 (Minn. 2020); *Fondessy Enterprises v. City of Oregon*, 23 Ohio St. 3d 213, 492 N.E.2d 797 (1986). See, also, e.g., Melissa Thorme, *Local to Global: Citizen's Legal Rights and Remedies Relating to Toxic Waste Dumps*, 5 Tul. Envtl. L.J. 101 (1991).

Reading all the relevant statutes in pari materia, we find that by granting NRDs the duty and power under the NGWMPA to issue permits for drilling new wells within the local NRD's territory, the Legislature did not intend to deprive other municipalities of their statutory authority to require permits for wells within the wellhead protection area designed to "provide protection from contaminants which may have any adverse effect on the health of persons served by the public water supply system of each participating controlling entity."[54] In conclusion, the Legislature did not intend field preemption through the NGWMPA.

We also hold there is no conflict preemption. Marjorie argues Ordinance No. 328 kept her from drilling her well for which she had a permit from the Upper Big Blue NRD, thereby directly conflicting with the "mandate that she is to commence construction as soon as possible"[55] under § 46-738 and the Upper Big Blue NRD's regulatory definition of a "permit" as "a document obtained, in accordance with the [NGWMPA] and these rules and regulations, authorizing the construction or modification of a water well or its use."

Because it was the denial of her application for a permit, rather than the permit requirement of Ordinance No. 328, that led to these alleged conflicts, this is an as-applied challenge, not a facial challenge as Marjorie suggests. As relevant here, conflict preemption applies where state law specifically permits the conduct that local law specifically prohibits. The NGWMPA does not specifically permit drilling new wells in wellhead protection areas. Nor does Ordinance No. 328 specifically prohibit drilling new wells in the wellhead protection area. Thus, it is unclear how conflict preemption applies. Regardless, the requirement of § 46-738 that a permittee complete construction within 1 year or risk losing the permit does not suggest that the power of the NRDs to

---

[54] § 46-1504(5).

[55] Brief for appellant at 29.

grant permits is exclusive. As for the regulatory definition of "permit," absent a statute's express intent otherwise, we do not incorporate regulations vertically into an in pari materia reading of statutes.[56]

### Interfering With Existing Farming

Lastly, we consider whether by denying the permit, Polk violated § 17-1001(3) because the denial interferes with the conduct of existing farming operations. Section 17-1001(3) provides in full:

Any city of the second class or village may apply by ordinance any existing or future zoning regulations, property use regulations, building ordinances, electrical ordinances, and plumbing ordinances within its extraterritorial zoning jurisdiction, with the same force and effect as if such area was within its corporate limits. No such ordinance shall be extended or applied so as to prohibit, prevent, or interfere with the conduct of existing farming, livestock operations, businesses, or industry. The fact that the extraterritorial zoning jurisdiction or part thereof is located in a different county or counties than some or all portions of the municipality shall not be construed as affecting the powers of the city or village to apply such ordinances.

The "conduct of existing farming" specified in § 17-1001(3) has not been further defined by statute or our case law.

Assuming without deciding that this limitation would apply to drilling a new well within a wellhead protection area governed by the Wellhead Protection Area Act, we agree with the district court that the existing farming at the time the permit was requested was dryland farming. We agree that it was the deterioration of the relationship between Marjorie and her neighbor, who had until that time permitted her to use the well located on the neighbor's land, which prevented

---

[56] See *State v. Albarenga, supra* note 17.

Marjorie from farming with irrigation. It was not the denial of the permit. Accordingly, the conduct of existing farming was not prohibited, prevented, or interfered with by the application of Ordinance No. 328. The district court did not err in concluding that Ordinance No. 328 as applied did not violate § 17-1001(3).

## CONCLUSION

For the foregoing reasons, we dismiss for lack of jurisdiction the appeal from the court's decision denying the petition in error and affirm the court's decision denying declaratory judgment.

Affirmed in part, and in part dismissed.