IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

CERRA V. CERRA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JESSICA M. CERRA, APPELLEE,

V.

ROBERT J. CERRA, APPELLANT.

Filed October 14, 2025.    No. A-24-726.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Affirmed as modified.

Kelly T. Shattuck, of Vacanti | Shattuck | Finocchiaro, for appellant.

Kimberly J. Workman, of Binning & Plambeck, L.L.P., for appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Sarpy County District Court dissolved the marriage of Jessica M. Cerra and Robert J. Cerra. Robert appeals, claiming that the district court created a conditional decree that did not allow him to have supervised visits with his daughter while he was incarcerated and left all future visits up to an "unknown expert" chosen by Jessica. Robert also claims that the court incorrectly valued and allocated certain property and debts and improperly included his premarital assets when valuing and dividing the marital estate. We affirm as modified, resulting in Robert's marital equalization judgment being reduced from $62,652.39 to zero.

## II. BACKGROUND

Jessica and Robert were married on April 14, 2018. They had one daughter, born in 2019. The parties separated on July 15, 2022, after Robert assaulted Jessica.

- 1 -

Jessica filed a complaint for dissolution of marriage in October 2022, and in December, the district court granted temporary legal and physical custody of the parties' daughter to Jessica. Robert was given supervised parenting time for 2 hours twice each week, and daily video calls for up to 10 minutes. In Jessica's amended complaint, she sought legal and physical custody of the parties' child, permission to remove the child to Iowa, child support, an equitable division of the parties' assets and liabilities, and attorney fees.

On August 28, 2023, Robert was sentenced in a criminal case on his convictions of second degree assault and use of a weapon to commit a felony. He was sentenced to 2 to 5 years' imprisonment on each count, with the sentences to run consecutively.

Trial in the divorce proceeding was held on June 14 and 26, 2024. Robert was incarcerated at the Nebraska State Penitentiary and did not appear either in person or via Zoom on the first day of trial, but he appeared via Zoom on the second day. Robert's attorney appeared at trial both days. Jessica and Robert both testified, as did Robert's parents, and numerous exhibits were received into evidence. Robert's father, Mike Cerra, testified that he had Robert's power of attorney and was authorized to act on Robert's behalf during the legal proceedings.

The parties agreed that Jessica should have legal and physical custody of their daughter, age 4 at the time of trial, and that Jessica could remove the child to Iowa. Robert's parenting time and the parties' assets and debts were contested at trial; we will discuss the evidence as necessary later in our analysis.

In August 2024, the district court allowed the parties to submit affidavits regarding Robert's motion to reopen the evidence to note his relocation since the trial to the Community Corrections Center in Lincoln, Nebraska. He claimed the new facility had a different visitation procedure than at the penitentiary.

On September 4, 2024, the district court entered a decree dissolving the parties' marriage. The court awarded sole legal and physical custody of the parties' child to Jessica, subject to parenting time by Robert, as set forth in the parenting plan attached to the decree. The court found that Robert committed domestic abuse against Jessica, and that it was therefore "required by Statute to create a parenting plan that imposes limits 'that are reasonably calculated to protect the child or child's parent from harm.'" Pursuant to the court's parenting plan, Robert "may have parenting time with the minor child under therapeutic visitation by a licensed therapist"; Robert "shall provide reasonable notice and advance request to [Jessica] to participate in any therapeutic sessions set by the therapist which recommends the participation of [Robert]"; and Jessica "shall pick the therapist." The court granted Jessica permission to permanently remove the child to Iowa and ordered Robert to pay Jessica $50 per month in child support.

The district court also valued and divided the parties' property and debts. Robert was ordered to pay Jessica $62,652.39 to equalize the marital estate. Each party was ordered to pay their own attorney fees.

Robert appeals.

## III. ASSIGNMENTS OF ERROR

Robert assigns, reordered and restated, that (1) the district court erred by creating a conditional decree that did not provide a realistic mechanism for him to maintain a relationship with his daughter and placed the outcome of all future visits in the hands of an "unknown expert"

chosen by Jessica, and (2) the court incorrectly valued and allocated certain property and debts and improperly included his premarital assets when valuing and dividing the marital estate.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. PARENTING TIME

The parties agreed that Jessica should have legal and physical custody of their daughter, and that Jessica could remove the child to Iowa. Robert's parenting time remained an issue at trial.

### (a) General Legal Principles

The relevant propositions of law regarding parenting time are well established in Nebraska. In *Sulzle v. Sulzle*, 318 Neb. 194, 216-17, 14 N.W.3d 532, 550 (2024), the Nebraska Supreme Court reiterated:

> The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.
>
> The authority to determine custody and visitation cannot be delegated, because it is a judicial function. . . . The rule that custody and visitation of minor children are to be determined on the basis of their best interests clearly envisions an independent inquiry by the court. Delegation of the court's duty to determine custody and visitation could result in the denial of proper visitation rights of the noncustodial parent.

When a court is required to develop a parenting plan, Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) permits limitations to parenting time or other access for a parent if the preponderance of the evidence demonstrates the parent has, among other things, "committed domestic intimate partner abuse." If a parent is found to have engaged in such activity, "limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." *Id.* Limitations permitted by § 43-2932(1)(b) include, but are not limited to:

> (i) An adjustment of the custody of the child, including the allocation of sole legal custody or physical custody to one parent;
>
> (ii) Supervision of the parenting time, visitation, or other access between a parent and the child;
>
> (iii) Exchange of the child between parents through an intermediary or in a protected setting;

(iv) Restraints on the parent from communication with or proximity to the other parent or the child;

(v) A requirement that the parent abstain from possession or consumption of alcohol or nonprescribed drugs while exercising custodial responsibility and in a prescribed period immediately preceding such exercise;

(vi) Denial of overnight physical custodial parenting time;

(vii) Restrictions on the presence of specific persons while the parent is with the child;

(viii) A requirement that the parent post a bond to secure return of the child following a period in which the parent is exercising physical custodial parenting time or to secure other performance required by the court; or

(ix) Any other constraints or conditions deemed necessary to provide for the safety of the child, a child's parent, or any person whose safety immediately affects the child's welfare.

Additionally, Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) requires that in determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id.* The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id.*

(b) Evidence at Trial

Jessica testified that the parties' marriage was "broken" on July 15, 2022, when Robert assaulted her with a baseball bat, and "chased" her from their house to a neighbor's house "where he continue[d] to assault [her]" on the front porch. (Video footage from the neighbor's Ring camera shows Robert punching Jessica and jumping on her, while she screams.) Jessica's injuries included a head injury that required 11 staples, a concussion, a black eye, and bruises on her ribs and arms.

The parties' daughter was not present during the incident. Robert was subsequently convicted of second degree assault and use of a weapon to commit a felony. On August 28, 2023, he was sentenced to 2 to 5 years' imprisonment on each count, with the sentences to run consecutively. It was the understanding of Robert's father that Robert was on drugs at the time of the July 2022 assault.

Jessica testified that she obtained a domestic abuse protection order against Robert on July 18, 2022, that protected both her and the parties' daughter. Because of the protection order, there was no visitation of any kind between Robert and the parties' daughter until December, "and then it was court-ordered for Zoom phone calls, and then he had the visitation specialist set up in January [2023]." Jessica was present during the Zoom calls and said that Robert talked about "adult topics" with their daughter and made "sexual harassment comments" towards Jessica.

When the district court's temporary order gave Robert supervised visits, his parents offered to supervise those visits. However, Jessica was concerned about Robert's parents supervising visits because she "felt like they didn't take into consideration [Robert's] drug use," and "[t]hey acted like . . . the drug use and Robert's behaviors were not of any concern and that they weren't an issue." When asked if she believed Robert's parents were considering her daughter's best interests, Jessica responded, "I feel that they are concerned about Robert's best interests."

It was Jessica's understanding that Robert was asking the district court to allow their daughter to visit him in prison; however, Jessica did not believe that would be in the child's best interests. She also did not believe that allowing Robert to have Zoom visits with their daughter while he is incarcerated would be in the child's best interests.

Robert testified that prior to July 15, 2022, he and his daughter were "very close." Since July 15, he tried to maintain his relationship with his daughter and exercised every opportunity available when the district court ordered visitation, but he only saw her 4 hours per week. Robert has had no visitation with his daughter since August 2023.

Robert proposed that the district court allow his parents to facilitate in-person visits between him and his daughter "at least once a month" for 3 hours while he is incarcerated, and that he be allowed weekly video visits. When asked how long he expected to be incarcerated, Robert responded, "Hopefully for about another 14 months until parole eligibility." He wanted to be awarded face-to-face visitation with his daughter "[b]ecause talking over a phone," "or even doing Zoom meetings, there's no emotional connection between people." According to Robert, the psychologist who worked with him at the facility was willing to monitor his first in-person visit with his daughter.

Robert's parents testified that Robert and his daughter had a "great" relationship, "very close, loving." Robert's parents were willing to facilitate any visitation awarded by the district court and provide all transportation.

Dr. Glenda Cottam, a clinical psychologist, testified that she was hired by Robert to evaluate whether it would be in the child's best interests to visit him while he was incarcerated. When she initially agreed to be involved, Dr. Cottam indicated that she wanted to interview both parents and meet the child. She also wanted to have "visitation records," for which a release was signed but she had not yet received them. Robert had signed a release for records from the counseling service where he had "MRT training," as well as a release for information from Robert's attorney in his criminal case; however, Dr. Cottam had not yet received records or

information from either of those places at the time of her testimony. Also, although she had wanted to interview Jessica and meet the child, she was not able to do so. (Jessica testified that she was not given enough time to set up the appointments and she needed more than 2 days' notice to miss work.)

Dr. Cottam interviewed Robert at the penitentiary "a few weeks ago" and he participated in various assessments. She also reviewed information from Northpoint, where he had treatment for approximately 1 month, and documents from persons who previously provided counseling to Robert. Dr. Cottam also reviewed affidavits, including those of the parties. She said her report was "based upon an appropriate level of psychological certainty," "[b]ut like many of my reports, I have information that could be improved if I had . . . additional interview[s]." Dr. Cottam stated, "I have given the best opinion that I can based upon the information that I have, but I would prefer to have more information."

Dr. Cottam opined that it was important for Robert and his daughter to have face-to-face contact "[b]ecause it relates to attachment and bonding, keep alive, you know, as much as possible, a child's positive memory and interactions, so that a child has contact with both parents." When asked if it was her opinion that it would be in the child's best interests to visit Robert while he is incarcerated, Dr. Cottam responded, "In general, it is a good thing for children and inmates to have contact in person or in some other modality," and that was something she would recommend in this case.

On cross-examination, Dr. Cottam stated that she had not been provided police records for Robert's assault of Jessica, nor had she seen the video of the assault, but she had seen photos of Jessica's injuries. When asked how Robert had described the assault to her, Dr. Cottam responded,

> He indicated that he had taken bath salts, and there was a verbal altercation in which his wife had said that she wanted a divorce or she's going to get a divorce and he would never see [their daughter] again. He indicated that he tried to get out of the home. He made a statement that she slapped or hit him in the face. He was trying to get out, but among his items, there was a child's baseball bat. He indicated that she put her fingers in or around his mouth, jaw, and he was in pain. That he left -- he was trying to leave. She tried to leave. He followed after her.
>
>  And it's my understanding that the neighbors basically opened up their door, and I assume called the police. He ran from the scene. And she was taken by ambulance to the hospital.

Robert did not explain to Dr. Cottam where he hit Jessica with the baseball bat, but Dr. Cottam had "already seen the photos, so . . . knew . . . the head had been injured," that "there were bruises on the arms," and "[t]he photos showed some stitches."

According to Dr. Cottam, if she had reviewed the police reports or had more information on the assault that took place, it was "possible" that it could impact her opinion on whether Robert should have in-person visits with the child. However, "based upon the information [she] did receive," she could tell that "it was a very violent attack," and she assumed it was "life-threatening." The video of a portion of the assault was played for Dr. Cottam while she was on the witness stand, and after watching the video, she said that it did not change her opinion as to visitations between Robert and the child, but that "therapeutic assistance would be helpful." She

also agreed that therapeutic Zoom visits could be appropriate in this case. "The temperament [of] the child is extremely important," [and] "[a]ny special diagnostic conditions, if the child has been diagnosed with anxiety disorders, all of those would need to be taken into consideration for the best interest of the child in balancing the contact."

(c) District Court's Ruling

The district court awarded sole legal and physical custody of the parties' child to Jessica, subject to parenting time by Robert, as set forth in the attached parenting plan. The court said that it was aware of facts that would make Robert an unfit or improper person to be involved in the parenting of the minor child. It found that Robert committed domestic abuse against Jessica, and that it was therefore "required by Statute to create a parenting plan that imposes limits 'that are reasonably calculated to protect the child or child's parent from harm.'" See § 43-2932(1). The court gave no weight or credibility to Dr. Cottam's testimony as to the best interests of the child, "as she testified that she had not met with nor interacted with the minor child or [Jessica] in forming an opinion." Although the court considered an affidavit from Robert's father regarding the visitation setting available at the Community Corrections Center where Robert had been relocated to after trial, "it does not change the Court's position that it must protect the best interests of the minor child and [Jessica]."

Pursuant to the district court's parenting plan,

1. [Jessica] shall have physical and legal custody of the minor child . . . .

2. [Robert] may have parenting time with the minor child under therapeutic visitation as supervised by a licensed therapist and as coordinated with such therapist. [Robert] shall provide reasonable notice and advance request to [Jessica] to participate in any therapeutic sessions set by the therapist which recommends the participation of [Robert]. Thirty-day notice shall be provided to [Robert] of therapy sessions in which his participation would be recommended by the therapist. If it is determined that it would not be therapeutically beneficial to the child for [Robert] to participate in therapeutic visitation, a written document quarterly will be sent to [Robert] setting out the therapeutic reasons why his participation is not therapeutically beneficial. If there is a dispute involving the child's therapeutic visitation, the parents shall follow the provision of mediation [in the parenting plan].

3. [Jessica] shall pick the therapist . . . . Such therapist will be designated by [Jessica] within 30 days of the date of this order. . . .

4. In the event that the parents, consulting with the therapist, agree on a specific parenting time that the therapist determines is therapeutically beneficial to the minor child, the visitation shall occur with the minor child at a therapist's office with [Robert] participating via electronic means . . . where the therapist may monitor the conversation and protect the best interests of the minor child.

5. This plan may be changed by mutual, written agreement of the parties, but any permanent changes must be approved by the Court to be binding and enforceable.

REMEDIATION PROCESS REGARDING FUTURE MODIFICATION TO THIS PARENTING PLAN

- 7 -

In the event the noncustodial parent becomes able to be actively involved in parenting the minor child(ren) and one or both of the parties wish to change the terms of this plan in the future, if the parties are unable to agree on the terms of such change, the parties shall attempt to mediate their disagreements . . . .

(d) Did District Court Abuse Its Discretion?

The district court found by a preponderance of the evidence that Robert committed domestic partner abuse against Jessica; Robert does not challenge that finding. The court was then required to impose limits reasonably calculated to protect the child and Jessica from harm. See § 43-2932(1). It is with that portion of the decree and parenting plan that Robert takes issue.

Robert claims that the district court created a conditional decree that did not provide a realistic mechanism for him to maintain a relationship with his daughter and placed the outcome of all future visits in the hands of an "unknown expert" chosen by Jessica. Brief for appellant at 24. He argues, "The obvious results can be assumed that Jessica will oppose any expert willing to allow visits as she testified she was opposed to any visits." *Id.* at 26. He further argues that he previously had regular visits supervised by his mother and there was no expert testimony or other specific evidence offered that this was detrimental in any way to the minor child.

In response, Jessica argues that Robert "fails to adequately acknowledge that after the court determined that domestic violence had occurred, the court was required . . . to develop a Parenting Plan pursuant to Neb. Rev. Stat. § 43-2932, which includes putting protections in place to protect both Jessica and [the child]." Brief for appellee at 22. She contends that the district court did not err in developing its parenting plan. Additionally, Jessica does not read the court's order to be a conditional order giving him specific visitation with certain conditions. Instead, she reads the parenting plan to "eliminate[] Robert's parenting time while still allowing Robert to request visitation with certain protections in place." *Id.* at 25. She cites us to *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019).

In *VanSkiver, supra*, the mother moved to modify and suspend the father's parenting time pending family therapy, alleging that his erratic and threatening behavior had escalated and that the children were frightened of him. The district court found that the children were at risk for mental abuse from their father and expressed its intent that the order would allow the children to see their father at their discretion. The district court's order stated that the children could decline visitation with the father that was set forth in the parenting plan and that no overnight visitations would take place until the father engaged in individual mental health counseling and then counseling with the children, after which he could petition the court for additional parenting time. The father appealed, in part claiming that the district court improperly delegated to the children the right to determine whether to exercise parenting time with him. The Nebraska Supreme Court reiterated the concept of impermissible delegation of judicial authority, but it ultimately affirmed the district court's order as modified because the order, in substance, suspended visitation rather than delegating judicial authority, and the suspension of visitation was justified.

The Nebraska Supreme Court noted that the father's argument that there had been an improper delegation of the district court's authority to establish parenting time was premised on the assumption that when the court modified his parenting time, it retained the specific blocks of

scheduled parenting time awarded previously, but authorized the children to decide whether he could exercise that parenting time. The Nebraska Supreme Court found that while that was a plausible interpretation of the district court's language, it was not convinced that it was the proper interpretation.

The Nebraska Supreme Court stated that it was guided by the district court's expressed intentions.

Before articulating the terms of the modified parenting plan, the court stated its intent was to "enter an order to allow the boys to see their father at their discretion." This does not suggest to us that the court intended to retain any enforceable parenting time with [the father]. To the contrary, we understand the court as stating an intent to completely eliminate [the father's] enforceable parenting time, while simultaneously acknowledging the practical reality that the boys may at times still wish to spend time with their father.

*Id.* at 673, 930 N.W.2d at 575. It found that the district court "developed a modified parenting plan designed to protect the children from [their father's] harmful behavior by suspending all of his scheduled parenting time," and it clarified the district court's order accordingly. *Id.* at 673-74, 930 N.W.2d at 576. The Supreme Court then found that the suspension of the father's parenting time was not an abuse of discretion.

Jessica notes that the district court's parenting plan provided in part that Robert "may have parenting time with the minor child under therapeutic visitation as supervised by a licensed therapist and as coordinated with such therapist." She claims that "[t]he use of the word 'may' in the parenting plan suggests that the court intended for this visitation to be permissive, not mandatory," and that the district court "effectively suspended all of Robert's parenting time, while still providing an avenue for which Robert may request parenting time that would ensure that no harm would come to Jessica or [the child]." Brief for appellee at 26. We agree with Jessica.

Like the Nebraska Supreme Court in *VanSkiver, supra*, we find that the district court's decree and parenting plan, in substance, suspended Robert's visitation rather than delegating judicial authority to an "unknown expert" chosen by Jessica. Specific language in the parenting plan includes: Jessica "shall have physical and legal custody of the minor child"; Robert "*may have parenting time* with the minor child under therapeutic visitation by a licensed therapist"; Robert "shall provide reasonable notice and *advance request to* [*Jessica*] to participate in any therapeutic sessions set by the therapist which recommends the participation of [Robert]"; "[i]n the event that the parents, consulting with the therapist, agree on a specific parenting time that the therapist determines is therapeutically beneficial to the minor child" such visits will occur via electronic means and monitored by the therapist; the parenting plan "may be changed by mutual, written agreement of the parties, but any *permanent changes must be approved by the Court to be binding and enforceable*." (Emphasis supplied.) Additionally, the parenting plan specifically states that "[i]n the event [Robert] becomes able to be actively involved in parenting the minor child(ren) and one or both of the parties wish to change the terms of this plan in the future, if the parties are unable to agree on the terms of such change, the parties shall attempt to mediate[.]" We read the foregoing language to completely suspend Robert's enforceable parenting time, while simultaneously acknowledging the practical reality that therapeutic visitation may be beneficial to the parties' daughter at some point, and/or that Robert's circumstances and ability to parent may

change in the future. Additionally, we find that the suspension of parenting time was justified to "reasonably protect" the parties' 4-year-old daughter and/or Jessica. We cannot say that the district court abused its discretion regarding parenting time.

## 2. MARITAL ESTATE

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde, supra*. The burden of proof rests with the party claiming that the property is nonmarital. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

The equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Parde v. Parde, supra*.

### (a) Residence

Jessica testified that the parties' home was purchased in April 2017, while the parties were engaged but not yet married. A closing disclosure statement lists Robert as the "Borrower" of a $147,250 loan for the home, which was purchased for $155,000. The home was refinanced during the marriage and Jessica's name was added to the deed. She had the home appraised in October 2023 and it was valued at $245,000. According to Jessica, the home was in substantially the same condition in October 2023 as it was in July 2022, and she believed the appraisal value was a fair and accurate value for the home. There was still a principal mortgage balance of $147,908.78 on the home as of July 19, 2022, 4 days after the parties separated. Jessica wanted to be awarded the marital home. Mike (Robert's father) asked that the marital residence be sold and the equity "split."

The district court found that the marital home was valued at $245,000, had an encumbrance of $147,908.78 at the time of separation, and a marital equity of $97,091.22. The home was awarded to Jessica, subject to the mortgage.

Robert argues that the district court improperly included his premarital down payment on the home in the marital estate. Robert claims his down payment was $13,290; however, according to the April 2017 "Closing Disclosure" statement, $13,290 was the "Cash to Close." The statement shows Robert's down payment was $7,750, which is consistent with the home purchase price of $155,000 and the April 2017 loan balance of $147,250.

In response, Jessica argues that there was no evidence as to the value of the home a year later at the time of the parties' marriage in April 2018, nor was there evidence as to any encumbrance on the home at the time of the parties' marriage. Additionally, there was no evidence as to the value of the home or any encumbrance at the time the parties refinanced the home during the marriage. "As such, the court found Robert failed to meet his burden of any premarital interest in the home." Brief for appellee at 13.

In *Stava v. Stava*, 318 Neb. 32, 43, 13 N.W.3d 184, 193 (2024), the Nebraska Supreme Court stated that "property that a party brings into the marriage is usually excluded from the marital estate" and "the equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property." However, when marital funds are used to pay down the mortgage on what was initially separate property, a proportionate marital interest in that property is acquired. See *id.* This is "regardless of how many different mortgages existed during the marriage." *Id.* at 44, 13 N.W.3d at 194. The *Stava* court cited to *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001), wherein the court recognized that marital payments to a mortgage encumbering a premarital property created marital property that included its passive appreciated value; while the court agreed, in theory, any equity in the house before the marriage should have been set aside as the husband's separate property, the husband had failed to establish what that amount was, and therefore the district court did not err in including the entirety of the equity in the residence in the marital estate.

Here, Robert purchased the residence for $155,000 in April 2017, a year prior to the parties' marriage. At the time of the purchase, he made a down payment of $7,750; this would have been immediate equity in the residence. By the time of the appraisal in October 2023, the value of the residence had increased to $245,000; therefore, the funds from Robert's $7,750 down payment would have still been in existence. Because the down payment was identifiable and traceable, the district court abused its discretion when it did not set off that amount as Robert's premarital asset. As for any additional premarital equity in the home at the time of the parties' marriage, Robert failed to establish any such amount, and therefore we cannot say that the district court erred in including the remaining home equity in the marital estate.

Robert claims that he should be given credit for 1 year of monthly mortgage payments he made prior to the parties' marriage. However, since he did not raise this argument at trial, we need not consider it on appeal. See *Johnson v. Village of Polk*, 319 Neb. 352, 23 N.W.3d 96 (2025) (appellate court does not consider arguments and theories raised for first time on appeal). Regardless, any payments made prior to the parties' marriage would have been considered in the context of Robert's equity in the home at that time, and we have already determined he failed to prove the amount of that equity, other than the down payment discussed above.

(b) 1991 Toyota 4Runner

Jessica stated that the 1991 Toyota 4Runner was purchased by Robert prior to the marriage and it was a "rock crawler toy vehicle." She said it "was rebuilt to be capable of driving off road," and "it has special tires, special framing, roll cage, equipment to make it so it's somewhat safe to use in driving conditions that a normal car cannot do." When asked to list some of the modifications made to the vehicle during the marriage, she replied, "[s]everal sets of tires, air-conditioning," and they have had to "replace and repair the parts that broke during [off-roading]

trips." Jessica did not know the specific amount that was spent on modifications during the marriage. When asked her opinion on the value of the vehicle with the modifications, she replied, "3,000." However, in her proposed asset division, she valued the vehicle at $20,000, which "includes lift kit, tires, other modifications, etc."

It was Robert's position that the 1991 Toyota 4Runner was premarital. The title for the vehicle was received into evidence. The title was issued to Robert as the "[o]wner" on October 28, 2014, and shows an "LP" of $17,300. Pictures taken by Mike on May 16, 2014, show that "the carriage" was already raised. According to Mike, the vehicle did not need significant maintenance or repairs on a regular basis "because [Robert] only drives it once a year." Robert was asked if he made any modifications or repairs to the vehicle during the marriage, and he responded, "just general maintenance." Mike did not believe the vehicle should be considered a marital asset, but if it is, he asked the district court to use the Kelly Blue Book value for the vehicle. Exhibit 64 shows a Kelly Blue Book "Private Party Value" of $1,907 as of September 1, 2023, for a 1992 Toyota 4Runner (although the evidence was that Robert had a 1991 Toyota 4Runner).

The district court found that the 1991 Toyota 4Runner had been "modified during the marriage, with marital funds, making it uniquely suited for 'rock climbing' and 'off roading.'" The "modified" vehicle "had a value at the time of separation in the approximate amount of $20,000.00." The vehicle was awarded to Robert in the division of the marital estate.

Robert argues the district court erred in including any equity of this vehicle into the marital estate. He claims this was "[a] $20,000.00 mistake that should be awarded solely to Robert as a nonmarital asset." Brief for appellant at 23. Jessica argues that there was conflicting testimony about whether modifications were done to the vehicle and "[t]he court did not abuse its discretion in finding Jessica to be more credible in valuing the asset." Brief for appellee at 17.

We do not know what the value of the 1991 Toyota 4Runner was on the date of the parties' marriage in April 2018. We likewise do not know if the vehicle was encumbered at the time of the marriage and, if so, whether marital funds were used to pay the encumbrance. There was conflicting evidence about whether modifications were made to the vehicle during the marriage and the resulting value of the vehicle. However, the district court found that modifications were made to the vehicle during the marriage with marital funds, and that the value of the vehicle at the time of the parties' separation was $20,000. This was consistent with Jessica's testimony, despite Robert's testimony to the contrary. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another; trial court weighs credibility of witnesses and evidence and determines what evidence should be given greater weight in arriving at factual determination on merits). Accordingly, based on the record before us, we cannot say that the district court abused its discretion when it valued the vehicle at $20,000 and did not set aside any equity in the vehicle to Robert as his separate property. See *Harris v. Harris, supra* (husband failed to meet his burden to prove amount of equity he had in residence at time of marriage; district court did not err in including entirety of equity in residence in marital estate).

(c) 2008 Toyota 4Runner

According to Jessica, the 2008 Toyota 4Runner was purchased during the marriage, but she did not recall the purchase price. Jessica opined that the vehicle had a value of $10,000, and she was not aware of any loan currently on the vehicle.

Mike presented the Kelly Blue Book "Private Party Value" for a 2008 Toyota 4Runner, which was $8,865 as of September 1, 2023. However, Mike believed that the vehicle should be valued at $7,300 because that is the "dealer trade-in" value.

The district court found that the 2008 Toyota 4Runner had a value of $10,000 at the time of separation, with no encumbrance. The vehicle was awarded to Robert in the division of the marital estate.

Robert argues that the district court valued this vehicle at $10,000 "based solely on Jessica's opinion," and that it was "not the best evidence of value." Brief for appellant at 23. However, as noted above, it is up to the district court to weigh the credibility of witnesses and evidence. See *Burgardt v. Burgardt, supra*. Accordingly, based on the record before us, we cannot say that the district court abused its discretion when it valued the vehicle at $10,000.

Additionally, Robert claims that the vehicle was paid off with money from his 401(k), and he argues that the district court "double counted" the vehicle's value "when it added it back" into the 401(k) valuation. However, as set forth in the next section, there was no evidence to show how much money was used from the 401(k) to pay for the 2008 Toyota 4Runner. We find the evidence in the record was insufficient to support Robert's claim that the vehicle's value was "double counted."

(d) Robert's 401(k) and IRA

Robert had a 401(k) through his employer before and during the marriage. Some statements for Robert's 401(k) were received into evidence. According to the statements, Robert's 401(k) reflected the following balances.

| | |
|---|---|
| 3-31-18 | $87,753.45 (2 weeks prior to marriage) |
| 12-31-21 | $121,697.85 |
| 3-31-22 | $123,190.67 |
| 6-30-22 | $110,782.39 (2 weeks prior to separation) |
| 9-30-22 | $11.55 |
| 12-31-22 | $-0- |

Jessica testified that during the marriage, $50,000 was withdrawn from the 401(k) and the money was used to pay off the parties' 2008 Toyota 4Runner and to pay off windows for the marital residence. According to Jessica, taxes were paid on that withdrawal in 2021. (Although the withdrawn amount is sometimes referred to as $53,000, the variation does not impact the marital equalization, as discussed next.)

Robert testified that the 2021 withdrawal from his 401(k) was a "loan" used to purchase windows for the marital residence, and that the 401(k) loan was paid back during the marriage with funds from his paycheck; "[e]very paycheck money got taken out." The 401(k) loan was fully paid "when I did the 401(k) rollover" on July 28 or 29, 2022. On cross-examination, Robert was asked if he had any documents to show that the 401(k) loan had been paid back; he responded, "I

would have to go back through all of my pay stubs . . . and I don't have those right now." He believed that the 2021 withdrawal was from marital funds.

Jessica noted that the 401(k) had a balance of $123,190.67 as of March 31, 2022 (before the parties' separation), but only $11.55 as of September 30 (after their separation). Jessica said that she did not receive, nor did she know what happened to, any money from that account during that time frame. She was not told by Robert that he was making withdrawals.

Mike testified that "everything was rolled into the IRA once [Robert] left [his employer]," but Mike did not say when that occurred. Robert testified that he did not have an IRA on July 15, 2022 (the date of the parties' separation). Robert was asked if he made withdrawals and deposits on his 401(k) and IRA accounts after the parties' separation. Robert replied, "Deposits, no. All I did was transfer money from my 401(k) on the date of separation from the company I was with, and I transferred it into my IRA." He later removed those funds from his IRA. On cross-examination, Jessica agreed that the IRA was funded with rollover money from the 401(k). Jessica stated that she did not receive, transfer, or withdraw any funds from the IRA account.

Some statements for Robert's IRA were received into evidence. The statement for the period from July 1 through September 30, 2022, shows that the IRA had an account balance of zero dollars as of June 30 (2 weeks before the parties' separation) and $38,983.26 as of September 30 (after the parties' separation); the statement shows that $44,663.33 was deposited during that period on an unspecified date(s) and there were no withdrawals. According to Mike, exhibit 60 is a "transaction history" for Robert's IRA; that exhibit shows two deposits totaling $44,663.33 on August 8, 2022. Another statement shows that the IRA had an account balance of $10,198.30 as of March 31, 2023, and zero dollars as of June 30, 2023.

Mike "believe[d]" that approximately $123,000 was cashed out of the 401(k) and that just under $39,000 went into the IRA; that left a difference of just over $84,000. Mike asked the district court to find that the $84,000 was premarital, pointing out that the 401(k) was worth more than $87,000 when the parties married. However, on cross-examination, Mike noted the 401(k) value as of the date of separation was $110,782.39, and he said he did not know how much was rolled over to the IRA when Robert cashed out the 401(k).

It was Mike's testimony that to the extent the district court did not find the $84,000 was premarital, that the money was nevertheless used for marital purposes. Mike stated that Robert used some of the 401(k) funds to pay for attorney fees in the divorce and criminal cases, the mortgage and bills "before [Jessica] got them turned over to her name," and his housing and living expenses "while he was out on pretrial" and "unemployed."

The district court found that the value of the 401(k) was $123,190.67 at the time of the parties' separation, "which [Robert] cashed out and has solely utilized the funds therefrom." The court also found that the IRA had a value of $44,663.33 at the time of the parties' separation, "which [Robert] has cashed out and has solely utilized the funds therefrom." Those funds were allocated to Robert in the division of the marital estate. However, we note that "to equalize the marital estate," the court ordered Robert to pay a specific amount to Jessica "as set forth in the Division of Assets" attached to the decree. The "Division of Assets" attached to the decree was Jessica's exhibit 24, wherein the 401(k) was valued at $123,190.67, but the IRA was valued at $38,983.26.

### (i) Robert's 401(k)

Robert argues that the district court "erroneously included into the marital estate his $87,753.45 of premarital equity in his 401(K) and erroneously charged [him] with using an additional $53,000.00 of the 401(K) for his purpose when it was soundly established the $53,000.00 was used to pay off a marital vehicle and new windows on the home." Brief for appellant at 20-21. He claims the total error related to the 401(k) was $140,753.45.

In response, Jessica states that the parties both testified about a withdrawal or a loan on the 401(k) account that was used to pay for windows on the home and a vehicle, and that Robert testified that he was repaying the "loan" through his paychecks and that it was fully paid off when he withdrew the remaining funds from his 401(k). She argues that the "401(k) value was already reduced by the $53,000.00 withdrawal and accounted for." Brief for appellee at 15. She also argues that Robert failed to trace his premarital interest in the 401(k) following the withdrawal or loan on the account in order to establish that any of his premarital funds were still in the account. She contends that the district court did not abuse its discretion in determining that the 401(k) account was marital or in valuing the account.

The record reflects that Robert's 401(k) had a balance of $87,753.45 as of March 31, 2018, 2 weeks prior to the parties' marriage. Usually, that amount would be excluded from the marital estate and set aside to Robert as his premarital property. See *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024) (property that party brings into marriage is usually excluded from marital estate). The value of Robert's 401(k) increased during the marriage, with the district court finding its value to be $123,190.67 at the time of the parties' separation. There is no indication that the balance ever dipped below Robert's premarital balance of $87,753.45. There was evidence of only one transaction related to the 401(k) prior to the parties' separation, that being the 401(k) loan for $50,000 that was used to pay off windows for the marital home and the 2008 Toyota 4Runner. Despite borrowing the $50,000 from Robert's 401(k), the account still had a balance of $123,190.67 near the time of separation, and Robert's paystubs showed deductions for payments on that loan. Because the $87,753.45 in premarital funds were identifiable and traceable, and there was no evidence to indicate that the balance on the 401(k) ever dropped below that threshold amount, the district court abused its discretion when it did not set off that amount as Robert's premarital asset. Robert is not entitled to any additional credit for paying off the 401(k) marital loan (whether $50,000 or $53,000) because he did not provide any evidence as to how much was still owed on the loan when he cashed out his 401(k) and used some of the funds to pay off the loan.

### (ii) Robert's IRA

Robert argues that "[t]he origin of the $38,983.26 [IRA] valuation is murky at best," and the district court "ignored the fact the value used included the funds transferred from Robert's 401(K) to this IRA account that was essentially double counted by the court." Brief for appellant at 21.

In response, Jessica argues that "Robert failed to provide adequate tracing" demonstrating that his IRA account contained funds from his 401(k) withdrawal. Brief for appellee at 16. She points out that transaction history (exhibit 60) "fails to establish the source of the deposits" into the IRA. *Id.*

We agree with Robert that the district court "essentially double counted" the money in the IRA. Brief for appellant at 21. Both Mike and Robert testified that Robert withdrew money from his 401(k) and put some of it into his IRA on or after the date of the parties' separation. And during cross-examination, Jessica agreed that the IRA was funded with rollover money from the 401(k). There is no evidence that any additional marital funds were deposited into the IRA. Accordingly, we find that the $38,983.26 had already been accounted for in the district court's valuation of the 401(k), and therefore the court abused its discretion when it included this money again when valuing the IRA.

### (e) 401(k) Penalty and Taxes

At trial, Mike was asked, "Of the $123,190 that Robert has taken from the 401(k), and we established that some of it went into an IRA that has also now been cashed out," "[t]here's going to be a 10 percent early withdrawal [penalty] on those funds, and that he'll be responsible for that; correct?" Mike answered in the affirmative. He was also asked if there was an expectation that Robert would be taxed at a 22 percent tax rate on those funds, and Mike again answered in the affirmative. Mike asked that the early withdrawal penalty and tax assessment be allocated to Robert as a marital debt.

In its decree, the district court did not specifically mention any early withdrawal penalty or tax assessment related to the 401(k) withdrawal. The court did order each party to pay all debts incurred by them after the separation date, as well as any and all debts solely in their name.

On appeal, Robert argues that "this potential debt and penalty should be equally shared as it was used for marital purposes at least in the amount of $53,000." Brief for appellant at 24. We assume the $53,000 reference relates to the 401(k) loan money used for windows on the marital home and for the 2008 Toyota 4Runner.

In response, Jessica points to her testimony that the money for the windows and the 4Runner was withdrawn from the 401(k) in 2021 and that the taxes were already paid on that withdrawal. Regarding the subsequent withdrawal when Robert cashed out his 401(k), Jessica argues that she was not made aware of the transaction prior to the withdrawal, she had no choice in the withdrawal of funds, she did not benefit from the withdrawal, and the money was not used for marital purposes. "Had Jessica had the opportunity to say what she wanted to do with the funds that would have been awarded to her, she could have invested that money into her own 401(k), avoiding a tax penalty." Brief for appellee at 22. We agree with Jessica that she should not be liable for a penalty and tax assessment that was caused by Robert's unilateral decision to withdraw the funds from the 401(k).

Based on our review of the record, we cannot say that the district court abused its discretion when it did not include the penalty and tax assessment as a marital debt.

### (f) Coinbase

Jessica and Robert had separate bank accounts. When Jessica reviewed Robert's banking statements that were provided to her during discovery, she was concerned about the "Coinbase" transactions and how much money was put into the Coinbase accounts; the total amount of the Coinbase transactions was $17,429 from June 1, 2021, through July 11, 2022. Jessica believed that Robert used marital funds to invest in Coinbase, and of the $17,000 that was invested in Coinbase,

Jessica stated that "$150" remained. She knew that Robert was using Coinbase, but did not know what he was using it for. However, in Robert's response to the second set of interrogatories, he stated that Coinbase was used "for drugs." Jessica asked that the Coinbase funds be set off to Robert in the distribution of the marital estate. According to her testimony on cross-examination, Jessica did not know what the value of the Coinbase shares were as of July 15, 2022, and she did not know the value of the shares when they were redeemed.

Mike believed that the Coinbase account should be valued at $150 "[b]ecause most of it was investment banking, just like the 401(k)," "[s]o [Robert] was investing into Coinbase, and then when Bitcoin tanked, it tanked with it . . . [i]t's just high risk investment banking." However, in Robert's response to the second set of interrogatories, he stated that "[n]o crypto[currency] was ever sold, just traded for drug habit"; "Coinbase for drugs."

The district court found that Robert utilized Coinbase for his drug use and that the transactions totaled $17,429 from June 2021 through July 2022. "These funds were marital assets, used solely for the benefit of [Robert], and which in no way benefited the family." The court determined that Robert "dissipated marital assets in the amount of $17,429" and allocated that amount to Robert in the property distribution.

Robert argues that the district court's "asset valuation was based solely on the amount paid for the initial investment," but Mike testified the value was reduced to $150 because of market forces. Brief for appellant at 22. Robert contends that he "should not be penalized for the market loss." *Id.* at 23.

We find no abuse of discretion in the district court's decision to value the Coinbase account at $17,429. This was the actual value of the loss to the marital estate and Robert admitted in the interrogatories that Coinbase was used for his drug habit.

(g) Robert's Drug Treatment Debt

Jessica testified that for "[a]bout a year before" the assault incident, Robert was "acting erratically." She initially thought that Robert "had a brain tumor or something severely medically wrong with him," but then he told her he was using drugs. Jessica "told him we needed to start looking into rehab centers," but "[h]e wanted to try local AA meetings first"; however, he did not try AA. Jessica researched rehab centers and "had him set up" for one or two. She said "[h]e did attempt to go to one in Texas," "but he came back saying that that place was a joke, they were mean to him, harassing him, and he could not go there"; he "checked in and checked back out the same day." That was prior to the July 2022 assault. Jessica stated that Robert did not enroll in Northpoint for treatment "until after it was court-ordered with the criminal case." She neither agreed to nor was consulted about the treatment at Northpoint.

Mike confirmed that Robert battled a drug addiction during the parties' marriage, and Robert took steps to get help "[a]fter we confronted him." It was Mike's understanding that Robert was on drugs at the time of the July 2022 assault. According to Mike, Robert had already been admitted to Northpoint Recovery prior to the July incident. Mike stated, "When [Robert] left Texas, I called Northpoint myself to see what it would take to get him in there. And they said they had already talked to Robby, and his admission date was Monday, July 18th. So he was just waiting a couple more days to get into Northpoint, but he was already set up." Robert confirmed that he

- 17 -

was scheduled to be admitted to Northpoint Recovery Center prior to the July 15 assault and he claimed that he and Jessica had conversations about the treatment.

A billing statement from Northpoint Recovery was received into evidence; it shows that as of January 30, 2023, there had been electronic payments of $42,888, insurance payments of $3,444, and patient payments of $14,500, and there was a current patient balance of $24,388. Mike believed that those payments and the balance owed should be assessed to Robert as marital debt.

The district court stated that the parties "stipulate" that each party shall be responsible for their own debts in their individual names. The court subsequently ordered that "[e]ach party is responsible for and shall pay all the debts incurred by them personally after the separation date of the parties, July 15, 2022."

Robert does not agree that he "stipulated to paying this bill solely" and he believes "it is a joint obligation" because his recovery started prior to the parties' separation and the parties had agreed he should attend treatment. Brief for appellant at 23. Jessica argues that the Northpoint charges were not incurred until after the parties' separation on July 15, 2022, and that the district court "correctly determined Robert's court-ordered drug treatment for his violent attack against [her] did not create a marital debt." Brief for appellee at 20.

We agree with Robert that he did not "stipulate" that the Northpoint treatment bill should be his alone. However, the district court did not abuse its discretion when it ordered that each party is responsible for and shall pay all the debts incurred by them personally after the separation date, July 15, 2022. This would include the Northpoint bill, as Robert did not begin treatment at Northpoint until after July 15.

(h) Equalization Payment

In its decree, the district court determined the parties' equalization payment by first calculating that the net value of the assets awarded to Jessica totaled $97,091.22 and the net value of the assets awarded to Robert totaled $222,396, for a total marital estate of $319,487.22. The court equally divided that number, which meant that each party was entitled to $159,743.61 in value. Since Jessica had been allocated $97,091.22 in assets, the court determined that Robert owed her $62,652.39 to equalize the marital estate ($159,743.61 - $97,091.22).

However, as set forth previously in this opinion, we found that the district court abused its discretion by not giving Robert credit for his premarital down payment on the residence ($7,750), by not setting off Robert's premarital 401(k) value ($87,753.45), and by double counting $38,983.26 in funds that were transferred from Robert's 401(k) to his IRA. The total amount of these adjustments equals $134,486.71. Therefore, Robert's share of the marital estate is not $222,396, but $87,909.29 ($222,396 - $134,486.71). The total value of the marital estate is now $185,000.51, which divided by 2 equals $92,500.255. We illustrate below the district court's formula, as modified by this court.

|                      | Jessica's Assets | Robert's Assets      |
| -------------------- | ---------------- | -------------------- |
| District court value | $97,091.22       | $222,396.00          |
| Modified on appeal   |                  | - 7,750.00 (house)   |
|                      |                  | - 87,753.45 (401(k)) |
|                      |                  | - 38,983.26 (IRA)    |
|                      | $97,091.22       | $ 87,909.29          |
| Total Marital Estate | $185,000.51 ÷ 2 = $92,500.255 | |

Because Jessica was awarded $97,091.22 in marital assets, Robert does not owe her any money to equalize the marital estate, and we modify the decree accordingly. While our corrections to the district court's decree now leave Robert with slightly less than one-half of the marital estate, we find that the overall distribution of the marital estate is fair and reasonable. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023) (as general rule, spouse should be awarded one-third to one-half of marital estate, polestar being fairness and reasonableness as determined by facts of each case).

## VI. CONCLUSION

For the reasons stated above, we conclude that the district court abused its discretion by not crediting as premarital property Robert's down payment on the home and his 401(k) value at the time of the parties' marriage, and by double counting funds in Robert's IRA. We therefore modify the property equalization judgment owed by Robert to Jessica from $62,652.39 to zero. The remainder of the district court's decree is affirmed.

AFFIRMED AS MODIFIED.